UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

|  |  |  |
|---|---|---|
| JENNIFER A. DURAND, | : | |
| | : | |
| WALTER J. WHARTON, and | : | |
| | : | |
| MICHAEL A. TEDESCO, | : | |
| | : | |
| On behalf of themselves and on | : | |
| behalf of all others similarly situated, | : | |
| | : | Case No. 3:07-CV-130-JDM |
| Plaintiffs, | : | |
| | : | |
| v. | : | CLASS ACTION |
| | : | |
| THE HANOVER INSURANCE GROUP, INC. | : | |
| | : | |
| THE ALLMERICA FINANCIAL CASH | : | |
| BALANCE PENSION PLAN, | : | |
| | : | |
| Defendants. | : | |

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' PARTIAL MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT

Eli Gottesdiener
GOTTESDIENER LAW FIRM, PLLC
498 Seventh Street
Brooklyn, NY  11215

E. Douglas Richards
E. DOUGLAS RICHARDS PSC
619 Cooper Drive
Lexington, KY 40502

*Counsel for Plaintiffs and the proposed Class*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................2

BACKGROUND ....................................................................................................9

ALLMERICA PLAN...........................................................................................15

ARGUMENT .......................................................................................................17

I.      Claim One: Unlawful Projection Claim...........................................17

II.     Claim Two: Unlawful Investment Crediting Claim..........................19

        A.      The Unlawful Investment Crediting Claim States a Valid Claim for Relief .........20

        B.      The Unlawful Investment Crediting Claim is Timely .........................................27

III.    Third Claim: Unlawful Cutback of Accrued Benefits ......................30

        A.      The Unlawful Cutback Claim States a Valid Claim for Relief............................31

        B.      The Unlawful Cutback Claim is Timely................................................39

IV.     Claim Four: The 204(h) Notice Claim States a Valid Claim for Relief and is Timely .....43

V.      Claim Five: Fiduciary Breach Claim ................................................44

        A.      The Fiduciary Breach Claim States a Valid Claim for Relief ..............................45

        B.      The Fiduciary Breach Claim is Timely................................................48

CONCLUSION....................................................................................................49

**INTRODUCTION**

The Allmerica Financial Cash Balance Plan, adopted and administered by its sponsor (Defendant The Hanover Insurance Group, Inc., referred to here as "Allmerica"), is an ERISA-governed defined benefit pension plan under which each employee's retirement benefit is defined by reference to the amount in the employee's notional "cash balance" account at normal retirement age, age 65.  *See* First Amended Complaint ("Amended Complaint," "Complaint," or "FAC") (Doc. 46) Parties ¶¶ 11-12, Claims ¶¶ 15, 18.

Before the Plan was frozen effective December 31, 2004 as to any new benefit accruals, an employee's notional account balance was credited with hypothetical employer contributions for each year of employment.  *Id.* ¶ 17.  Each hypothetical contribution consisted of two parts:  *One*, a notional dollar amount equal to a percentage of the employee's salary for the year ("compensation credit"); and *Two,* the stream of anticipated hypothetical earnings on the compensation credit through age 65 under the Plan's investment-crediting formula ("stream of "earnings credits").  *Id.* ¶ 22.  An employee's normal retirement benefit under the Plan is an amount equal to her notional account balance plus anticipated earnings through age 65 – *i.e.*, an amount equal to the employee's anticipated notional account balance at age 65.  Any distribution of benefits before age 65 must have an actuarial value that is no less than the normal retirement benefit, based on a projection of what the account balance would have been at age 65 had the employee left her money in the Plan until that age.  *Id.* ¶¶ 15-20, 24-26, 34.

The First Amended Complaint, filed December 11, 2009, includes five related claims arising out Defendants' miscalculation of the benefits that participants earned under the Plan between January 1, 1995 and December 31, 2004.  The new complaint is more detailed than the original complaint, reflecting information gleaned from documents Defendants attached to their subsequent filings and Defendants' various explanations of their benefit calculation

methodologies over the course of nearly three years of litigation in the District Court and the

Court of Appeals.  But the conduct challenged in the new complaint arises out of the same

conduct that Ms. Durand set out in the original complaint – or attempted to set out as best she

could at the time – as is detailed in the new complaint.

Ms. Durand made clear three years ago that she intended to put at issue, on behalf of all

participants who had ever accrued a vested benefit under the Plan's cash balance formula,

Defendants' benefit calculation methodology -- whether or not those fellow participants had

already received a benefit distribution, when they received or will receive a distribution, or in

what form they received or will receive a distribution.  Her class allegations, which Defendants

have had for over three years and finally answered in May 2009 (Doc. 27), make this

unmistakably clear:  Ms. Durand informed Defendants she was suing on behalf of:  "All

persons who participated in the Allmerica Cash Balance Pension Plan who vested or will vest

in an accrued benefit under the Plan's cash balance formula between January 1, 1995 and

December 31, 2004; and the beneficiaries and estates of such persons." Orig. Compl. ¶ 30;

*compare* Amended Compl. Claims ¶ 2 (similarly defining overall proposed class before

defining proposed subclasses).  This description of the proposed class includes not just

participants who received a distribution before Defendants purported to eliminate the Plan's

401(k)-style investment menu, and not just participants electing lump sums, but on behalf of

**every participant who ever accrued a cash balance formula benefit**.

What this means, as explained more fully below, is that one of the main thrusts of the

instant motion – statute of limitations, *see* Def. Mtn. (Doc. 51) at ¶¶ 1, 2, 4; Def. Mem. (Doc.

52) at 6-9, 14-18, 25-26 – is plainly lacking in merit because each of the complaint's now-

more-specifically delineated claims relate back to the original filing under Fed. R. Civ. P.

15(c).  This point is confirmed by the extrinsic evidence, also discussed more fully below,

which shows that Defendants were on notice that these more particularized challenges to their

benefit calculation methodologies were coming.

Additionally, or alternatively, even absent relation back, all asserted claims are timely

because Defendants admittedly (*see* Def. Mem. at 29) failed to disclose to participants in the

Summary Plan Description ("SPD") or anywhere else the Plan's central operating principle:

the projection of notional account balances to normal retirement age using the 30-year

Treasury bond rate, based on the obviously-flawed assumption that that was the rate of return

at which each employee's account balance would have grown had they left their benefit in the

Plan and continued to hypothetically invest in the Plan's 401(k) menu of mutual funds until

age 65.  Defendants' statute of limitations defense hence fails as a matter of law because

without this basic information about how the Plan actually calculated benefits, no ordinary

participant could have been expected to perceive that the Plan's use of this hidden projection

methodology caused him or her *injury,* the participant's actual or constructive discovery of

which is the *sine qua non* to the triggering of the statute of limitations.

Turning to the substance of Plaintiffs' claims, they are all clearly viable on the merits:

**1.**      ***Claim One* or the "Unlawful Projection Claim."**  This claim is an amended

version of  the so-called "whipsaw" claim alleged by Ms. Durand in the original, March 9,

2007 Complaint (Doc. 1) ("Original Complaint" or "Orig. Compl.") on behalf of herself and

all other Plan participants receiving benefit distributions between January 1, 1995 and August

17, 2006 (the effective date of the Pension Protection Act of 2006, which exempts certain

plans from the whipsaw requirement on a prospective basis, *see West v. AK Steel Corp. Ret.*

*Acc. Pension Plan,* 484 F.3d 395, 411-12 (6th Cir. 2007)).

This claim asserts that for employees who received benefit distributions before age 65,

Defendants used a methodology to estimate the value of each employee's normal retirement

benefit that resulted in violations of ERISA's actuarial equivalence and nonforfeiture rules. Specifically, it is alleged that rather than making individualized ***projections*** of what each employee's account balance actually would have been at age 65 had they left their benefit in the Plan and continued to hypothetically invest in the Plan's 401(k) menu of mutual funds, the Administrator merely used the assumed rate of return set forth in the Plan equal to the 30-year Treasury rate.  FAC ¶¶ 33-36, 66-68, 72-74, 84.

As indicated above, this claim contains more detail than did its counterpart from the original complaint – for example, by specifying that the projection rate used to compute lump sums should have been based on the *greater-of* the two interest crediting rates promised under the Plan, *i.e.,* the participant-generated investment return or, if greater, the 30-year Treasury rate for that year.  *Id.* ¶ 33.  Nevertheless, Defendants do not seek dismiss any aspect of this claim.  *See* Def. Mtn. at 1-2; Def. Mem. at 4 n.2.

Although already a member of the putative class Ms. Durand alleged in the original complaint, new plaintiff Walter Wharton, who received a lump sum distribution from the Plan in 2005, seeks to assert an Unlawful Projection Claim in his own right as well.  FAC ¶¶ 72-74.[1]

**2.** ***Claim Two* or "Unlawful Investment Crediting Claim.**"  This claim also is an elaboration of the unlawful forfeiture claim in the original complaint.  *See* Orig. Compl. ¶ 27. It is brought by Ms. Durand, Mr. Wharton and new plaintiff Michael Tedesco.  Mr. Tedesco, like Mr. Wharton, is already a member of the putative class alleged in the original complaint. However, unlike Ms. Durand and Mr. Wharton, Mr. Tedesco has yet to receive a distribution from the Plan.  FAC ¶ 62.

---

[1] The Amended Complaint contemplates that when Plaintiffs move for class certification, Ms. Durand (who received a lump sum distribution in 2003) and Mr. Wharton would serve as named representatives of two distinct subclasses:  a pre-2004 distribution subclass (Ms. Durand) and a 2004-2006 distribution subclass (Mr. Wharton).

The Unlawful Investment Crediting Claim that all three named plaintiffs assert alleges that Defendants used an unlawful methodology to calculate the earnings credits allocated to employees' hypothetical cash balance accounts.  Specifically, the claim is that the Plan's assumed future rate of return equal to the 30-year Treasury rate established a floor on the earnings crediting rate, so that the Plan Administrator was required to credit earnings each year at a rate equal to the Plan's 401(k)-menu rate, but never less than the 30-year Treasury rate. FAC ¶¶ 29-32, 65, 67-68, 71, 80.

Allmerica characterizes this claim as "novel[]," Def. Mem. at 12, which is both incorrect and particularly odd given that it is a point they themselves recognized, without prompting, during oral argument in the Sixth Circuit:

> The normal retirement accrued benefit is defined [in terms of] the 30-Year Treasury rate under [Internal Revenue] Code Section 417.  *That's a floor*.

Ex. 1, Transcript of the Oral Argument in *Durand v. The Hanover Ins. Group, Inc., et al.*, Case No. 07-6468 in the United States Court of Appeals for the Sixth Circuit, Tr. 34: 6-19, (emphasis added).  As discussed below, Defendants' failure to fully honor the floor they themselves voluntarily wrote into the Plan is a well-established violation of the prohibition against unlawful forfeitures of accrued benefits.

   **3.**   ***Claim Three* or "Unlawful Cutback Claim."**  This claim asserts that Allmerica violated ERISA when it amended the Plan (via the "2004 Cutback Amendment") to change the earnings crediting rate from a rate of return based on employees' hypothetical 401(k) investments to the 30-year Treasury rate, effective January 1, 2004.  The claim is that because future earnings credits through age 65 based on the 401(k) menu rate were part of each employee's ERISA-protected "accrued benefit," *see West v. AK Steel,* 484 F.3d at 408-09 ("future interest credits are part of a participant's accrued benefit"), the 2004 Cutback

Amendment necessarily resulted in an unlawful forfeiture of benefits.  FAC ¶¶ 57-59, 69-71.

Allmerica responds by arguing, for the first time after nearly three years of litigation, that

future returns pursuant to the 401(k) menu were not part of each employee's accrued benefit.

Def. Mem. at 19-21.  But that ship has sailed.  Defendants have repeatedly admitted (correctly)

over the past three years that employees' lump sum benefit distributions were required to

include the value of their projected 401(k)-menu returns through age 65.  *E.g.*, Mtn. to Dismiss

(Doc. 11, filed June 4, 2007) at 3 ("For early-terminated employees requesting a lump sum, the

Plan must project the future investment returns the employee otherwise would have earned on

the future investment portfolios the employee otherwise would have selected until he or she

reached normal retirement age").  The only reason early-departing employees would be

entitled to a benefit that included the value of their projected 401(k)-menu returns through age

65 would be if future menu returns through age 65 were part of the accrued benefit they had

*already earned* at the time of departure, rather than amounts they may have earned in the

future had they left their benefits in the Plan.  *See* IRS Notice 96-8, 1996-1 C.B. 359, Sec.

III.B.1 (whipsaw projection is required only with respect to benefits paid under a "frontloaded"

cash balance plan – *i.e.,* plans under which future interest credits are embedded in employees'

accrued benefits).

Allmerica's concession on the projection issue accordingly establishes that future menu

returns were part of each employee's December 31, 2003 accrued benefit, which means the

2004 Cutback Amendment necessarily was unlawful.  *See* Proposed Treasury Regulation

("Treas. Reg.").  § 1.411(b)(5)-1(d)(8) ("to the extent benefits have accrued under the terms of

a [cash balance] plan that entitle the participant to future interest credits, an amendment to the

plan to change the interest crediting rate for such interest credits violates [ERISA's anti-

cutback prohibition] if the revised rate under any circumstances could result in a lower interest

6

crediting rate . . . ”).

**4.**     *Claim Four* **or “204(h) Notice Claim.**”  This claim also focuses on the 2004 Cutback Amendment, but relates solely to the impact of the amendment on hypothetical contributions made to employees' cash balance accounts in 2004.  The claim is that Allmerica did not provide clear notice regarding the magnitude of the impact the 2004 Cutback Amendment would have on future benefit accruals.  Specifically, Plaintiffs allege that Allmerica failed to notify employees that the earnings crediting rate with respect to compensation credits allocated in 2004 would change from a rate equal to the greater of the 401(k) menu rate or the 30-year Treasury rate to simply the 30-year Treasury rate.  FAC ¶¶ 75-76, 81-82.  One of the few things upon which the parties agree:  that this claim rises or falls along with the Unlawful Investment Crediting Claim.  *See* Def. Mem. at 22.

**5.**     *Claim Five* **or “Fiduciary Breach Claim**.”  This claim is that the Plan Administrator breached its fiduciary duty under ERISA to act prudently and solely in the interest of Plan participants when it applied provisions of the Plan without independently assessing whether those provisions complied with ERISA, even in the face of direct challenges to the legality of the provisions by the U.S. Department of Labor.  FAC ¶¶ 37-48, 50-51, 86-90.

Allmerica asserts that the fiduciary breach claims are inadequately pled and nothing more than “re-cast” claims for benefits.  But Plaintiffs' allegations are more than sufficient to satisfy Rule 8 standards.  And the primary remedy Plaintiffs expect to seek to address the Plan Administrator's breach of fiduciary duty is an injunction prohibiting the Administrator (Allmerica) from participating in any recalculation of benefits that the Court may ultimately order in this case – a distinct remedy from the recalculation of benefits sought under Plaintiffs' benefit claims, which under Sixth Circuit jurisprudence makes the fiduciary breach claim a

viable independent cause of action.

## BACKGROUND

The Allmerica Plan is a cash balance pension plan.  While cash balance plans in some ways mimic 401(k) plans, the IRS and courts have cautioned that notwithstanding their account-based appearance, a "cash balance plan is a defined benefit plan, not a defined contribution plan, because the benefits provided are <u>not</u> based solely on *actual* contributions and forfeitures allocated to an employee's account and the *actual* investment experience and expenses of the plan allocated to the account," as under a 401(k) plan.  Notice 96-8, Sec. III.A (emphasis added); ERISA §§ 3(34), (35), 29 U.S.C. §§ 1002(34), (35); IRC §§ 414 (i), (j) (defining any plan that does not have actual individual accounts as a defined benefit plan).[2] *See also AK Steel,* 484 F.3d at 399.   Rather, the "contributions" and "investment experience" under a cash balance plan are hypothetical, notional – part of the *formula* used to define the benefits to which employees are entitled under the plan.  This notional structure is necessary because ERISA and the Internal Revenue Code "define[] an employee's accrued benefit differently for defined benefit plans than for defined contribution plans."  *Id.*  401(k) and other defined contribution plans define a participant's accrued benefit as simply his current account balance.  ERISA § 3(23)(B), 29 U.S.C. § 1002(23)(B); Internal Revenue Code ("Code" or "IRC") § 411(a)(7)(B).  Defined benefit plans, on the other hand, define a participant's accrued benefit as the "annual benefit commencing at normal retirement age" determined under the plan's stated benefit formula.  ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A); IRC § 411(a)(7)(A).  *See Esden v. Bank of Boston,* 229 F.3d 154, 158 (2d Cir. 2000).

Because the "investment experience" under a cash balance plan is notional, not real,

---

[2] *See Berger v. Xerox Corp. Ret. Income Guar. Plan,* 338 F.3d 755, 762 (7th Cir. 2003) (Posner, J.) (describing Notice 96-8 as "authoritative"); *AK Steel,* 484 F.3d at 410 (same).

plans can – and often do – indefeasibly commit to credit employee account balances with a future stream of notional interest or investment returns at a stated rate or pursuant to a stated formula.  Indeed, "[c]ash balance plans can be categorized based on when the benefits attributable to interest credits accrue."  Notice 96-8, Sec. III.A.  Under one type of plan, referred to by the IRS as "backloaded" interest credit plans, "benefits attributable to interest credits do not accrue until the interest credits are credited to the employee's account," as under a 401(k) plan.  Notice 96-8, Sec. III.A.  But these "backloaded" plans are problematic under ERISA (because of the stricter standards that apply to defined benefit plans as opposed to 401(k) plans) and are almost unheard of.  *Id.  See Berger,* 338 F.3d 762 ("To be tax-qualified**, *a cash balance plan must be 'frontloaded,'*** IRS Notice 96-8, . . . that is, must include interest on the money in the employee's hypothetical account for the period between his leaving the employer and his reaching age 65.  Otherwise [such plans would be impermissibly backloaded]" (emphasis added)).

As a result, almost all cash balance plans, including the Allmerica Plan, are "frontloaded."  Under a "frontloaded interest credit plan[], future interest credits to an employee's hypothetical account balance are not conditioned upon future service."  Notice 96-8, Sec. III.A.  Rather, "the benefits attributable to future interest credits with respect to a hypothetical [compensation-credit] allocation *accrue at the same time* that the benefits attributable to the hypothetical allocation accrue."  *Id.* (emphasis added).  In other words, future interest credits are not, as they are under a 401(k) plan, something an employee *might earn in the future* if he leaves his money in the plan.  **Future interest credits are actually baked into the benefit the employee has *already* earned**.  *See AK Steel,* 484 F.3d at 408 (agreeing with Seventh Circuit's conclusion in *Berger* "that future interest credits are part of a participant's accrued benefit. [Citing Notice 96-8]. A participant in the Xerox Plan had an

9

'absolute, vested, indefeasible entitlement ... to a pension at age 65 based on his cash balance as increased by future interest credits accruing between his departure and his reaching that age'").

The significance of this frontloading principle and its admitted application here cannot be overstated.  It means that under a frontloaded cash balance plan like Allmerica's, an employee's "accrued benefit" – the benefit he has indefeasibly earned to date – is equal to the sum of his current account balance *plus* the stream of interest credits promised under the plan through normal retirement age.  Notice 96-8 puts it thus:

> In the case of frontloaded interest credit plan, an employee's <u>accrued benefit</u> as of any date before attainment of normal retirement age is based on the employee's hypothetical account balance *as of normal retirement age*, **including future interest credits to that age**.

*Id.*, Sec. III.B.1 (emphasis added).[3]  The accrued benefit can be depicted mathematically as follows:

| **Accrued Benefit** | = | Current Account Balance | + | Stream of future earnings credits at plan's interest crediting rate, through age 65 |
|---|---|---|---|---|

Notice 96-8 provides a helpful example, based on a cash balance plan that provides for interest credits at a fixed rate of 8 % per annum.  As stated in the Notice, an employee's accrued benefit under the plan as of any date before attainment of normal retirement age (assumed to be age 65) is equal to the sum of his current account balance plus the stream of future interest credits payable through age 65 at an annual rate of 8 %.  *Id.*, Sec. II.A.  For instance, in the case of an employee who will attain age 65 on December 31, 2035, her accrued benefit as of December 31, 1997 could be depicted as follows:

---

[3] The Notice describes the accrued benefit as "based on" the account balance at age 65 because technically the accrued benefit is the age-65 balance expressed in terms of the annuity the age-65 balance would purchase at age 65.  ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A).

| 12/31/97 Accrued Benefit | = | 12/31/97 Account Balance | + | 8% interest in 1998 | + | 8% interest in 1999 | + | 8% interest in 2000 | + ... | 8% interest in 2035 |
|---|---|---|---|---|---|---|---|---|---|---|

The fact that an employee's accrued benefit includes future interest credits does not mean that an employee who terminates employment at age 32 is entitled to an immediate distribution equal to the amount depicted in the formula.  An employee's "accrued benefit" is the benefit to which the employee would be entitled if she were to terminate employment today but then wait to commence benefits until age 65.  ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A) (accrued benefit is benefit payable at normal retirement age); IRC § 411(a)(7)(A) (same).  If the employee wants an earlier distribution, ERISA and the Code quite rationally permit a plan to pay a discounted amount to reflect the time value of money.  But ERISA strictly regulates the manner in which the time-value adjustment can be made.  The rule is that any benefit distribution made before normal retirement age can be no less valuable than the *actuarial equivalent* of the accrued benefit.  ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3); *accord* IRC § 411(c)(3); Notice 96-8, Sec. III.B ("any single sum distribution payable to an employee from the plan must not be less than the nonforfeitable portion of the present value of the employee's accrued benefit under section 411(a)(7)"); *Esden,* 229 F.3d 163 ("This rule that regardless of any option as to timing or form of distribution, a vested participant in a defined benefit plan must receive a benefit that is the actuarial equivalent of her normal retirement benefit (that is, the accrued benefit expressed as an annuity beginning at normal retirement age) has been repeatedly recognized by courts"; collecting cases).

This pre-retirement "actuarial equivalence" requirement can present a challenge for cash balance plans because the "accrued benefit" that serves as the starting point for the equivalence calculation includes *future* earnings credits of potentially uncertain value.  This is

11

not always a concern: "If [a frontloaded interest] plan specifies a *fixed* interest rate for use in determining future interest credits, the employee's hypothetical account balance as of normal retirement age (including future interest credits) can be calculated precisely before normal retirement age" and there is no problem.  Notice 96-8, Sec. III.B.1 (emphasis added).  Under this type of plan, an employee's projected account balance at age 65 can be derived with precision using the following mathematical formula:

$$\text{Projected Account Balance at age 65} = \text{Current Account Balance} \times (1 + \text{int. rate})^{n} \quad \text{[where n is years until age 65]}$$

*See* Notice 96-8, Sec. II.A (showing the math for a plan with a fixed interest rate of 8 %).[4]

If the plan's interest crediting rate is *variable*, the math is not as straightforward because the "int. rate" variable in the projection formula above is not a fixed number.  Notice 96-8 acknowledges this complication:  "if a frontloaded interest credit plan specifies a variable outside index for use in determining the amount of interest credits, the precise dollar amount of an employee's hypothetical account balance as of normal retirement age (including future interest credits to normal retirement age), and thus the precise dollar amount of the employee's accrued benefit as of any date before normal retirement age, cannot be calculated prior to normal retirement age."  *Id.*, Sec. III.B.1.

But the IRS did not conclude, as Allmerica wants this Court to believe is the law, *see* Def. Mtn. to Dism. Orig. Compl. (Doc. 11) at 3 ("[n]ot knowing the future . . ."), that because the "precise" dollar amount of an employee's accrued benefit cannot be determined, a variable-rate cash balance plan is permitted to ignore ERISA's command that any pre-retirement benefit distribution must be the actuarial equivalent of the accrued benefit.  Rather, what ERISA

---

[4] The term $(1 + \text{int. rate})^{n}$ in the equation is the mathematical representation of the sum of interest credits reflected in the equation at the top of page 11, *supra*.

requires is that a plan with a variable interest rate must specify a methodology by which the plan can make a best *estimate* of what a participant's account balance would have been at retirement age had he left his money in the plan until that age.  Notice 96-8, Sec. III.B.1 ("A frontloaded interest credit plan that specifies a variable outside index for use in determining the amount of interest credits must prescribe the method for reflecting future interest credits in the calculation of an employee's accrued benefit"); *Durand v. The Hanover Ins. Group, Inc.,* 560 F.3d 436, 437 (6th Cir. 2009) ("the projection forward must have 'include[d] a *fair estimate*' of what the participant's future interest credits actually would have been had she retained a single-life annuity under the plan," quoting *Berger*, 338 F.3d at 761).

Under a cash balance plan with a variable interest crediting rate, then, the normal retirement benefit that serves as the starting point for calculating an actuarially equivalent immediate benefit is each employee's *estimated* accrued benefit, depicted as follows:

| Estimated Accrued Benefit | = | Projected Account Balance at age 65 | = | Current Account Balance | + | *Estimate* of what interest credits would have been through age 65 had benefits remained in the plan, using the objective and reasonable estimation method set forth in the plan |
|---|---|---|---|---|---|---|

Any benefit distribution paid to an employee before normal retirement age can be no less than the actuarial equivalent of this estimated accrued benefit.  More precisely, if an employee requests his benefit in the form of a single sum cash-out, the distribution cannot be "less than the present value of the employee's accrued benefit calculated in accordance with the applicable interest rate and mortality table under [ERISA  205(g), 29 U.S.C. § 1055(g), and Code] section 417(e)(3)." Notice 96-8, Sec. III.B.1.   If the distribution is in the form of an annuity, the annuity must be the actuarial equivalent of the accrued benefit using reasonable objective actuarial assumptions set forth in the plan.  ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), and IRC § 411(c)(3).  *See also* Treas. Reg. § 1.411(c)-1(e)(1) and IRC

§ 401(a)(25).

One final observation.  According to the IRS, all of the requirements summarized above apply even in the case of a cash balance plan that purports to define an employee's accrued benefit as an amount equal to merely the employee's current hypothetical account balance.  Notice 96-8, Sec. III.C.  This is because ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A) and IRC § 411(a)(7) "define[] the accrued benefit in terms of benefits payable under the plan *at normal retirement age*.  In a cash balance plan, for an employee who has not attained normal retirement age, "whether the employee's retirement benefit payable at normal retirement age under the plan includes benefits attributable to future interest credits depends on whether those benefits have accrued" in fact, regardless of what the plan purports to provide. Notice 96-8, Sec. III.C.  In other words, if cash balance plan is a frontloaded interest credit plan, an employee's "accrued benefit" is his "hypothetical account balance as of normal retirement age, including future interest credits to that age," even if the plan purports to provide otherwise.  *Id.*

## ALLMERICA PLAN

The Allmerica Plan was converted into a cash balance pension plan effective January 1, 1995.  Between 1995 and 2004, compensation-based credits were allocated to participants' notional cash balance accounts under the Plan each year in an amount equal to a stated percentage of each participant's compensation during the year.  Plan § 4.02.[5]  Between 1997 and 2003, the Plan provided that these compensation-based credits would be supplemented by "Investment Experience" credits equal to the return generated by hypothetical investments selected by each participant from among an investment menu identified by the Board of

---

[5] References are to sections of the Plan as in effect as of 1/1/97, which is the version of the Plan attached to Allmerica's motion to dismiss (Doc. 51) as Exhibit A.

Directors.  Plan § 4.03.  According to a series of Summary Plan Descriptions ("SPDs"),

Summary of Material Modifications ("SMMs"), and other communications distributed to Plan

participants between 1994 and 2003, the Investment Experience menu consisted of the same

investment funds offered under Allmerica's 401(k) Plan.  1995 SPD (Ex. 2) at 5 and Appendix

A; 1997 SMM (Ex. 3); 1999 SMM (Ex. 4).

By its express terms, the Plan defined the "Normal Retirement Accrued Benefit" as "a

benefit, projected at any time, of a Participant's Account Balance using the Code Section 417

Mortality Table and Code Section 417 Interest Rate."  Plan § 2.29.  During most of the period

relevant to this lawsuit, the Code Section 417 Interest Rate was the 30-year Treasury Rate.  *See*

Def. Mem. at 12 n.6.  Accordingly, each participant's Normal Retirement Accrued Benefit

under the Plan was equal to his current Account Balance projected to age 65, the normal

retirement age under the Plan, at the 30-year Treasury rate.  This definition is a "complete"

definition of an accrued benefit under a cash balance plan because it takes into account future

interest credits through normal retirement age in the manner described in Notice 96-8.[6]  As

such, it is an accrued benefit under the terms of the Plan to which participants are indefeasibly

entitled once vested.  *Heinz v. Cent. Laborers' Pension Fund*, 303 F.3d 802, 804 (7th Cir.

2002) ("ERISA protects the benefits described in the Plan"), *aff'd,* 541 U.S. 739 (2004);

*Contilli v. Local 705 Int'l Brotherhood of Teamsters Pension Fund*, 559 F.3d 720, 723 (7th

Cir. 2009) ("once a participant's right to a benefit has vested, the terms of a pension plan

cannot be changed to reduce the amount of that benefit").

---

[6] The same cannot be said of the "Accrued Benefit" which is defined under Plan § 2.01(a) as merely a
participant's current Account Balance.  The definition in § 2.01(a) accurately describes the accrued
benefit for a participant who has attained age 65, which apparently is its only purpose. *See, e.g.,* Plan
§7.06(v), which refers back to the "Normal Retirement Accrued Benefit" definition to determine the
amount of any pre-retirement benefit distribution, consistent with Notice 96-8.

## ARGUMENT

### I.   Claim One: Unlawful Projection Claim

Plaintiffs' Unlawful Projection Claim, alleged under both the Original and Amended Complaints, is that the Plan Administrator applied an unlawful Notice 96-8 methodology to project participants' notional account balances to age 65, resulting in an underpayment of benefits to Plaintiffs Durand and Wharton and other similarly-situated participants in the Allmerica Cash Balance Plan.  More specifically, the Complaint alleges that it was a violation of ERISA and the Code for the Plan Administrator to calculate the benefits paid to Plaintiffs Durand and Wharton and other similarly-situated participants by applying a methodology that failed to take into account the proper value of the future Investment Credits.  Rather than projecting the future investment returns the participants otherwise would have earned on their account balances based on an estimate of the future investment portfolios that they otherwise would have selected until they reached normal retirement age, the Plan unlawfully assumed that all participants would earn interest at the 30-year Treasury rate.  FAC ¶ 35.

The outcome of this claim depends on the resolution of two issues: *First*, whether the Investment Credits that were promised under the Plan between 1997 and 2003 were "frontloaded" within the meaning of Notice 96-8, so that they "accrue[d] at the same time" that the underlying compensation-based credits were allocated to each employee's account and therefore were an integral part of the benefits accrued by employees under the Plan; and *Second*, if so, whether the Plan Administrator used a lawful methodology to estimate the value of future Investment Credits when it made pre-retirement benefit distributions.

With regard to the first issue, Allmerica has conceded, and both this Court and the Sixth Circuit have accepted, that Investment Credits were not conditioned upon future service, which means the Investment Credits were "frontloaded" within the meaning of Notice 96-8.

*See* Notice 96-8, Sec. III.A. (under a "frontloaded interest credit plan[], future interest credits

to an employee's hypothetical account balance are not conditioned upon future service" and a

whipsaw calculation is therefore required):

- Def. Mtn. to Dism. Orig. Compl. (Doc 11) at 3 ("The earnings credits necessarily cease upon the termination of a participant's employment, **but interest credits continue through retirement based on the hypothetical investment return of the hypothetical investments**" which means that "[f]or early-terminated employees requesting a lump sum, the Plan must project the future investment returns the employee otherwise would have earned on the future investment portfolios the employee otherwise would have selected until he or she reached normal retirement age" – *i.e.*, "[t]he Plan was required to perform a 'whipsaw' calculation to determine the lump-sum benefit payable to participants (like plaintiff) who cashed out of the Plan before reaching retirement age") (emphasis added).

- Def. Appeal Br. (Ex. 5) at 8 ("Under the Plan, when a participant's employment terminated before normal retirement age, the earnings credits end, but **the account balance continues to be adjusted for the investment experience of the participant's chosen elections through retirement**") (emphasis added)

- Def. Ans. to Orig. Compl. (Doc. 27) ¶ 14 ("Defendants admit only that plaintiff had the right to leave her account balance in the Plan even after terminating employment or retiring and to **continue receiving investment credits,** and deny the remaining allegations of paragraph 14") (emphasis added)

- Def. Conf. Stmt. (Doc. 29) at 2 ("When a participant left the employ of the company prior to normal retirement age under the Plan (age 65), the participant could leave her money in the Plan and **continue to receive investment credits**, and then be paid the resulting account balance at age 65 (or later)") (emphasis added)

- *Durand v. Hanover Ins. Group, Inc.,* Civ. No. 07-130, 2007 WL 3342370, *1 (W.D. Ky. Nov. 9, 2007) ("*Durand I*") (Doc. 19 at 2), *rev'd on other grounds,* 560 F.3d 436 (6th Cir. 2009) ("The interest credits **continue through retirement** based on the hypothetical return of the hypothetical investments unless the participant elects an early lump sum distribution") (emphasis added)

- *Durand v. The Hanover Ins. Group, Inc.,* 560 F.3d 436, 437 (6th Cir. 2009) ("*Durand II*") ("Of importance here, '[**e]ven if the employee ceases working for the plan sponsor, interest credits continue** to accrue to the employee's hypothetical account until he or she begins receiving pension benefits'" (quoting *AK Steel*)) (emphasis added)

Regarding the second issue, again, Allmerica has effectively conceded, and this Court

and the Sixth Circuit have all but concluded, that the methodology used by the Plan

Administrator to estimate the value of future Investment Credits was *not* lawful under ERISA:

- Ex. 1, Def. Oral Arg. Tr. 23: 22-24;  *id.,* Tr. 31:19-21 ("We have never taken the position that the way that Ms. Durand's lump sum was calculated was absolutely right"; "Clearly it's been applied as a one-size-fits-all situation and **individualization is necessary**") (emphasis added)

- *Durand I* at *1 (Doc. 19 at 2-3) ("the Plan must project the future investment returns the employees otherwise would have earned on their account balances **based on the future investment portfolios that they otherwise would have selected** until they reached normal retirement age") (emphasis added)

- *Durand II* at 438 ("**But the Plan did not attempt to make individualized estimates** of departing participants' future interest credits. Instead, the Plan used a uniform projection rate – the 30-Year Treasury Bill rate – in performing every such participant's whipsaw calculation") (emphasis added).

As a result, all that really remains to resolve the Unlawful Projection Claim is for the Court to determine the ERISA-compliant methodology that must be used to determine what participants were really owed.  *Cf.*  Def. Resp. to Pl. Mot. to Compel (Doc. 43) at 3 ("the only issues are what choices each individual would have made in the future").  Plaintiffs' Conference Statement (Doc. 31-2) describes what Plaintiffs believe that required methodology to be.  *See* Doc. 31-2 at 3.

## II.     Claim Two: Unlawful Investment Crediting Claim

Plaintiffs' second claim, the Unlawful Investment Crediting Claim, is that the methodology used by the Plan Administrator to credit hypothetical interest to participants' Accounts is inconsistent with the terms of the Plan interpreted in a manner that complies with ERISA.  Specifically, Plaintiffs allege that Allmerica's interest crediting methodology fails to take into account the Plan's definition of "Normal Retirement Accrued Benefit," under which a participant's ERISA-protected accrued benefit is equal to the value of his current Account Balance projected to age 65 at the 30-year Treasury rate.  Under ERISA, the 30-year projection rate used to define the Normal Retirement Accrued Benefit establishes a floor on the rate at

which interest must be credited to participants' Accounts.  Allmerica's calculation and

payment of benefits to Plaintiffs and other similarly-situated participants using an interest

crediting rate that did not incorporate the 30-year Treasury rate floor resulted in an unlawful

forfeiture of benefits.  FAC ¶¶ 30-36, 65-68.

### A.    The Unlawful Investment Crediting Claim States a Valid Claim for Relief

As described above, the Plan defines a participant's "Normal Retirement Accrued

Benefit" as an amount equal to his current Account Balance projected to age 65 at the 30-year

Treasury rate – in other words, the sum of his current Account Balance plus the stream of

future interest credits at 30-year Treasury rate through age 65:

| **Normal Retirement Accrued Benefit** | = | Current Account Balance | + | Stream of future interest credits at 30-year Treasury rate, through age 65 |

"[B]enefits attributable to interest credits are in the nature of accrued benefits within

the meaning of section 1.411(a)-7(a), rather than ancillary benefits, and thus, once accrued,

must become nonforfeitable in accordance with a vesting schedule that satisfies [Code] section

411(a)" and ERISA § 203(a), 29 U.S.C. § 1053(a).  Notice 96-8, Sec. III.A.  Accordingly, ***the***

***Plan is required to preserve the value of each participant's Normal Retirement Accrued***

***Benefit calculated as of the end of each year*** – including the portion of the benefit represented

by the stream of future interest credits at the 30-year Treasury rate reflected in the Plan's

accrued benefit formula depicted in the formula above.  *Id.*  This is exactly what the IRS said

in Revenue Ruling 2008-7:

> in order to avoid a forfeiture of the accrued benefit under [a cash balance] plan
> . . . the annual benefit payable at normal retirement age attributable to the [cash
> balance] benefit formula *at the end of the current year* must not change thereafter,
> . . . disregarding any future pay credits."

2008-7 I.R.B. 419, 2008 WL 274325, paragraph preceding "Drafting Information" (emphasis

added).[7]  Contrary to Allmerica's assertion, Def. Mem. at 12, this portion of the ruling applies

to cash balance plans generally, as reflected by its citation in a letter from the IRS to Alliant

Energy for exactly the proposition Plaintiffs allege here.  *See* October 2, 2009 IRS Ltr. (via

Employee Plans Specialist Ortiz) to Alliant Energy (via counsel Renz) ("Alliant Energy

letter"), attached as Ex. 6

        The value of each participant's Normal Retirement Accrued Benefit (disregarding new

compensation-based credits, per Rev. Rul. 2008-7) will be preserved from one year to the next

only if the interest credited to a participant's notional Account in any year is never less than

the 30-year Treasury rate embedded in the Normal Retirement Accrued Benefit. To illustrate,

take the same employee used in the example in the Background section above who will attain

age 65 on December 31, 2035.  Her Normal Retirement Accrued Benefit as of December 31,

1997 can be depicted as follows:

| **12/31/97 Normal Retirement Accrued Benefit** | = | 12/31/97 Account Balance | + | Interest at 30-year Treasury rate for 1998 | + | Interest at 30-year Treasury rate for 1999 | + ... | Interest at 30-year Treasury rate for 2035 |

If the amount actually credited to the employee's Account in 1998 is equal to the 30-year

Treasury rate for that year, the employee's Normal Retirement Accrued Benefit as of

December 31, 1998 would be:

| **12/31/98 Normal Retirement Accrued Benefit** | = | 12/31/98 Account Balance, equal to 12/31/97 balance plus interest at 30-year Treasury rate for 1998 | + | Interest at 30-year Treasury rate for 1999 | + ... | Interest at 30-year Treasury rate for 2035 |

---

[7] The Ruling provides that in measuring whether the accrued benefit changes from one year to the next, relevant factors (*i.e.*, variables in the formula) are assumed to remain constant. *Id.* Thus, for example, no forfeiture is deemed to occur merely because the 30-year Treasury rate drops from one year to the next.

This December 31, 1998, Normal Retirement Accrued Benefit has exactly the same value as the December 31, 1997 value.  The only change between the 12/31/97 Accrued Benefit and the 12/31/98 Accrued Benefit is that the 30-year Treasury rate credit for 1998 is re-characterized from a *future* credit (in the 1997 equation) to an *actual* credit that has become part of the 1998 year-end Account Balance (in the 1998 equation).  The value of the Normal Retirement Accrued Benefit is therefore preserved from one year to the next, satisfying the ERISA nonforfeiture standard summarized in Revenue Ruling 2008-7.

Compare this with the situation where the interest credited to an employee's account is *less* than the 30-year Treasury rate that is embedded in the Normal Retirement Accrued Benefit.  For example, assume the Plan credited the employee's Account with interest in 1998 at a rate of 1% instead of the 30-year Treasury rate, which in 1998 was approximately 6%:

| **12/31/98 Normal Retirement = Accrued Benefit** | 12/31/98 Account Balance, equal to 12/31/97 balance + plus 1% interest for 1998 | Interest at 30-year Treasury rate for 1999 | + ... | Interest at 30-year Treasury rate for 2035 |
|---|---|---|---|---|

Unlike in the example above, here the December 31, 1998, Normal Retirement Accrued Benefit has a *lower* value than the December 31, 1997 Normal Retirement Accrued Benefit. This is because the 12/31/97 Accrued Benefit included a future interest credit for 1998 at the 30-year Treasury rate (approximately 6%), which was replaced in the 12/31/98 Accrued Benefit with an actual interest credit of only 1%.  This reduction in value reflects an unlawful forfeiture of a portion of the employee's December 31, 1997 accrued benefit that occurred solely because the employee left her money in the Plan for an additional year instead of termination employment and taking an immediate distribution.  *See* Rev. Rul. 2008-7; Notice 96-8; *Contilli,* 559 F.3d at 722 ("a reduction in the total value of all monthly benefits is a kind

of forfeiture" *citing Berger* and *Esden*).

To ensure that this type of forfeiture does not occur, ERISA and the IRS require that cash balance plans with designs such as Allmerica's credit **interest** each year at a rate that is *no less than the projection rate* used to calculate accrued benefits under the plan.  Of course, if the plan by its terms otherwise commits to an annual crediting rate that is higher than the plan's projection rate, the plan is still bound by that commitment.  The projection rate sets a <u>floor</u>.  Ex. 1, Def. Oral Arg. Tr. 34: 16-19 ("That's a floor").  In other words, what ERISA requires is that the interest credited in any year must be equal the *greater* of the crediting rate promised under the express terms of the plan or the projection rate.  Under the Allmerica Plan, this means interest must be credited each year at a rate equal to the greater of (i) the rate of return generated from participant-selected Investment Credits or (ii) the 30-year Treasury rate for the year.[8]

Although Defendants characterize Plaintiffs' allegation that the Plan's 30-year Treasury *projection* rate establishes a floor on the Plan's *crediting* rate as "leaping to [] conclusion[s]," Def. Mem. at 11, it is identical to the considered position taken by the IRS in its review of the Code-compliant status of cash balance plans with designs materially identical to Allmerica's.  *See* FAC Exs. 1-3.  Allmerica contends that "nothing in [the IRS correspondence attached to the Complaint] suggests that a lump sum distribution method can somehow change a Plan's interest crediting rate."  Def. Mem. at 13.  But that is *exactly* what the letters say.

_____

[8] As described in ¶¶ 33, 66, 72 and 84 of the Amended Complaint, if Plaintiffs are correct that the interest crediting rate is the greater of a participant's hypothetical investment returns or the 30-year Treasury rate, this same greater-of rate must also be used for the projection to normal retirement age that is the subject of the Unlawful Projection Claim, a proposition Allmerica does not dispute.  *See* Notice 96-8 (projection rate must equal interest crediting rate); Danaher letter, FAC Ex. 1 at 2, 4, discussed in the text below (after concluding that greater-of interest crediting rate required, instructing sponsor to "remember whatever rate is used for crediting interest must be used to project interest to normal retirement").

For example, the correspondence between Danaher Corporation and the IRS addresses a cash balance plan design that is materially identical to the Allmerica Plan's design:  Annual interest credits to the hypothetical cash balance accounts of employees are equal to the return generated by the hypothetical portfolio constructed by each employee from a 401(k)-style investment menu – but for purposes of calculating accrued benefits in the manner required under Notice 96-8, the plan *projects* participants' account balances to normal retirement age based on the 30-year Treasury rate.  According to the IRS, the only way this design can comply with ERISA is if the plan <u>credits</u> *and* <u>projects</u> interest using the "*greater of* (1) the rates elected by the participant [via his hypothetical 401(k) investment elections], or (2) the 30-year rate."  FAC Ex. 1 at 2, July 14, 2009 IRS Ltr. (via Employee Plans Specialist Futch) to Danaher (via counsel Talley) ("Danaher letter") (emphasis added).[9]

In a follow-up letter dated September 10, 2009, the IRS continued to press the point with Danaher, explaining that:

> you have a problem if the rate used to **credit** interest on the accounts is less than the 30-year interest rate used to **project** interest.  This is because [use of the 30-year interest rate to project interest means that] *the 30-year rate is built into the accrued benefit*, and if you deliver less than that rate when [you] *credit* interest on the account, the plan provides for impermissible forfeitures.  We are particularly concerned about the statements regarding interest credits in the 2001 plan year, when S&P returns were negative.  Therefore, at the very least please **provide that the *interest* crediting rate is no less than the 30-year rate**.

Ex. 7, Sept. 10, 2009 IRS Ltr. (via Employee Plans Specialist Futch) to Danaher (via counsel Talley) (emphasis added).  The IRS analysis is clear:  Because the plan used the 30-year interest rate used to *project* interest to normal retirement age for purposes of calculating lump sum benefits, the rate at which interest must actually be *credited* to participants' accounts each

---

[9] The Danaher and Draper letters, as well as the TAM, consider "backloading" as part of the analysis of the "mismatched interest credits" issue.  This part of the analysis is not relevant here because there is no dispute that the investment credits at issue here are frontloaded.  *See supra*, p. 17.

year cannot be less than that rate.

The August 5, 2008 letter to Charles Stark Draper Laboratory, Inc. re Retirement Plan for Employees of Charles Stark Draper Laboratory, Inc. ("Draper letter"), attached to the Amended Complaint as Ex. 2, sets forth the identical analysis and conclusion for another cash balance materially identical to Allmerica's:

> This plan provides that interest is credited using the rate determined based on investment return, but the benefit is converted to [*i.e.*, projected to] an annuity at normal retirement age using the 30 year Treasury Bill rate, meaning that the 30-year rate is used for the period between the date of determination and the participant and the participant's normal retirement age. In addition, the crediting rate can be changed by the participant's election to change Investment Funds. This creates several concerns. If the interest rate for the deferral period [*i.e.*, the projection rate] is <u>greater</u> than the crediting rate it will result in forfeiture, since there will be a loss of interest for each year the participant remains in the plan. * *

> This must be corrected in a way that does not violate the 'anti-cutback' rules of section 411(d)(6) of the Code. Therefore the ***interest*** crediting rate and the [***projection*** rate] must be the *larger of the two rates* currently in use.

FAC Ex. 2 at 2 (italics added; underlining in original). *See also* Alliant Energy letter, Ex. 6 at 3 (same, citing Rev. Rul. 2008-7 in support)

Finally, the Technical Advice memorandum ("TAM") attached to the Amended Complaint as Ex. 3, concludes that a cash balance with mismatched interest and projection credits:

> fails to meet the requirements of sections 411 and 417 of the Code, because, in calculating a participant's accrued benefit, the Plan *projects* interest to normal retirement date using a rate [the 30-year Treasury rate] other than the rate used to *credit* interest to the participant's cash balance account. In years when the projection rate exceeded the crediting rate there was a forfeiture of part of a participant's accrued benefit in violation of Code section 411(a) . . . .

FAC Ex 3 at 6 (Conclusion 1) (emphasis added). The TAM does not explicitly address the manner in which the failure could have been avoided, but that can be inferred from IRS's description of the problem – that the Plan *projects* interest to normal retirement

date using a rate "other than" the rate used to *credit* interest to the participant's cash balance account. The obvious correction would be to provide that the crediting rate is no less than the projection rate, as reflected in the letters above.

Notwithstanding the clarity of the analysis, Allmerica objects to Plaintiffs' citation of the letters and the TAM on the grounds that they were issued to unrelated taxpayers and are not authoritative. Def. Mem. at 12-13. Plaintiffs never claimed the letters or the TAM were directly binding here. The IRS analysis was attached to the Complaint so that the Court could see that Plaintiffs' position is not "novel[]" at all, *id.* at 12, as Plaintiffs anticipated Allmerica would contend, but consistent with the way the IRS itself has applied the principles expressed in Notice 96-8, Revenue Ruling 2008-7, and elsewhere to cash balance plans with designs materially identical to the Plan's. This is exactly the type of guidance, *i.e.,* the IRS's views on complex ERISA issues applied to particular analogous cases, that the Sixth Circuit has recognized as a legitimate basis for courts to arrive at the correct result in cases before them. *See, e.g., Thornton v. Graphic Commun. Conf. of the Int'l Brotherhood of Teamsters Suppl. Ret. and Disability Fund*, 566 F.3d 597, 612 (6th Cir. 2009) (relying on analysis set forth in letter from the IRS to an unrelated party not involved in the lawsuit). The TAM, which Allmerica recognizes reflects the analysis of the IRS Chief Counsel as to how Notice 96-8 and Treasury Regulations apply to cash balance plans with mismatched interest credits, is even more significant. Because "the IRS's reasonable interpretations of its own regulations and procedures are entitled to particular deference," *Am. Express Co. v. United States*, 262 F.3d 1376, 1383 (Fed. Cir. 2001) (*citing U.S. v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001)), Plaintiffs respectfully suggest that the Court would be hard-pressed to disregard the IRS's (and Plaintiffs') interpretation of Notice 96-8 in favor of Allmerica's

contrary reading.  *See Berger,* 338 F.3d at 762 (deferring to IRS interpretation).

Allmerica's contention that the Court is somehow foreclosed from enforcing the law as applied to the Plan because "the Plan's administrators never have interpreted the Plan as offering 'greater of' interest," Def. Mem. at 10, is absurd.  Neither did the Plan's administrators interpret the Plan to require "individualized estimates of departing participants' future interest credits," *Durand II* at 438, and yet that is what both this Court and the Sixth Circuit have concluded the Plan is required to do, with only the appropriate projection rate left to be determined.  *Id.*; *Durand I* at *1.  The fact that for many years Allmerica has interpreted and administered the Plan in a manner inconsistent with ERISA and Notice 96-8 does not mean Defendants are now somehow exempt from the law.  All it means is that Allmerica breached its duty to administer the Plan in a manner "consistent with the provisions of [ERISA]," as Defendants elsewhere have acknowledged has been required all along.  *See* Mtn. to Dism. Orig. Compl. at 15, citing ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);*see also* Reply in Supp. of Mtn. to Dism. Orig. Compl. (Doc. 18) at 9-10 (admitting that "pension plans governed by ERISA must incorporate provisions implied by law").

### B.      The Unlawful Investment Crediting Claim is Timely

In an ERISA case, a cause of action accrues when there has been a "clear and unequivocal repudiation" of benefits by a fiduciary which has been made known to the employee.  *Redmon v. Sud-Chemie*, 547 F.3d 531, 538 (6th Cir. 2008), *quoting Morrison v. Marsh & McLennan Cos.,* 439 F.3d 295, 302 (6th Cir. 2006) and *citing Bennett v. Federated Mut. Ins. Co.,* 141 F.3d 837, 839 (8th Cir. 1998).  The "clear repudiation" standard is the ERISA expression of the general federal discovery rule, under which a cause of action accrues when a plaintiff "discovers or with due diligence should have discovered, the injury that is the basis of the litigation."  *Bennett,* 141 F.3d at 839.

The injury that is the basis of Plaintiffs' Unlawful Investment Crediting Claim is Allmerica's use of an interest crediting methodology that failed to preserve the value of their Normal Retirement Accrued Benefit.  The two key facts underlying the Claim are that (1) the Plan defines each participant's Normal Retirement Accrued Benefit as his or her current Account Balance projected to age 65 at the 30-year Treasury rate, and (2) the Plan Administrator used an interest crediting methodology that did not take into account the Normal Retirement Accrued Benefit and its implicit guarantee of a crediting rate floor equal to the 30-year Treasury rate.

Through no fault of their own, Plaintiffs discovered the existence of each of these predicate facts only after they retained counsel and he disclosed their existence to them.  The reason these facts were not discovered earlier is that, far from "clearly and unequivocally repudiating" Plaintiffs' rights to an interest crediting rate that took into account the Plan's definition of Normal Retirement Accrued Benefit, the Plan Administrator *concealed the very existence* of the Normal Retirement Accrued Benefit.  Rather than telling participants the truth – that their accrued benefit under the terms of the Plan was equal to their current Account Balance projected to age 65 at the 30-year Treasury rate – the Plan Administrator repeatedly told participants in SPDs and other communications that their benefit was an amount equal merely to their current Account Balance.  FAC ¶ 89.  As Allmerica now concedes, participants had no idea that the Plan by its terms defined their accrued benefit:

> Rather than describe, as the Plan itself does, the projection rate forward (and, to be complete, the projection rate back), the SPD disclosed that upon taking a lump sum payment, a participant will 'receive the dollar value of your account . . . .'

Def. Mem. at 29.[10]

_____

[10] The Plan's definition of Normal Retirement Accrued Benefit and the manner in which it was calculated is hardly an idiosyncratic feature of the Plan that the SPD was not required to disclose, as

If the Plan Administrator did not tell Plaintiffs that there was a secret definition of Normal Retirement Accrued Benefit that defined their benefits by reference to the 30-year Treasury rate, how were Plaintiffs supposed to know that the Plan Administrator was crediting interest at a rate that did not take the 30-year rate into account?  Absent any notice in the SPDs (or otherwise) revealing the provisions of the Plan – the *facts* – on which their theory of liability is based, there certainly was no "clear repudiation by the fiduciary which is clear and made known to the beneficiaries" of benefits Plaintiffs allege should have taken those provisions into account.  *See, e.g., Bilello,* 607 F.Supp.2d at 593 (discovering the injury under a plan that violates ERISA requires clear notice of the relevant plan provisions).

In *Bilello*, relied upon by Defendants, Def. Mem. at 9, the court concluded that plaintiff's minimum interest rate claim had accrued shortly after his employer's plan was converted to a cash balance plan.  But that was because the first SPD issued after the date of conversion clearly informed Mr. Bilello about all the *facts* he needed to know – *i.e.*, the relevant terms of the plan – to develop his legal theory and bring a claim.  Mr. Bilello's claim was that the plan's benefit formula was inherently "backloaded," and the addition of an implied-by-law minimum interest crediting rate would cure the perceived defect.  The court concluded that because Bilello was clearly informed about the details of the allegedly backloaded accrual formula when the SPD first described the formula in 1999, that was the claim accrued for limitations purposes.  *Bilello,* 607 F.Supp.2d at 597.  The situation was thus very different from the situation here where the key fact underlying Plaintiffs' Unlawful Investment Crediting Claim – the existence of the Normal Retirement Accrued Benefit provision and its use of a 30-year Treasury projection rate to define accrued benefits – was not disclosed and indeed was concealed from Plaintiffs, as Allmerica concedes.  *See* Def. Mem. at

_____

Defendants imply.  *See* Def. Mem. at 29.

29.

As a result, the earliest possible date on which the Unlawful Investment Crediting Claim could have accrued is 2007, when counsel retained by Ms. Durand discovered the never-disclosed definition of Normal Retirement Accrued Benefit and brought the provision to her attention.  The Unlawful Investment Crediting Claim sounds in contract.  *See* Def. Mem. at 9 ("Federal common law rules of contract interpretation govern"); *West v. AK Steel*, 484 F.3d at 405 (cash balance Notice 96-8 claim can be pursued under ERISA § 502(a)(1)(B) for benefits due under the terms of a plan because the "key issue is whether West was paid less than the full accrued benefit due him *under the AK Steel Plan*" (emphasis added)).  Accordingly, the applicable statute of limitations is fifteen years under KRS § 413.090(2) (actions on written contracts), making the Complaint timely.  *See Santino v. Provident Life & Accident Ins. Co.*, 276 F.3d 772 (6th Cir. 2001); *Meade v. Pension Appeals & Review Comm.*, 966 F.2d 190 (6th Cir. 1992).  *Redmon*, cited by Defendants, is distinguishable because unlike the Plan-based contract claim here, the claim in *Redmon* was brought under a "theory of liability unknown at common law."  *See* 547 F.3d at 538.[11]  However, even if the Court were to apply a five-year limitations period, the Unlawful Investment Crediting Claim would be timely because both the Original and Amended Complaints were filed within five years after Plaintiffs discovered the Normal Retirement Accrued Benefit provision of the Plan in 2007, as discussed above.[12]

## III.     Third Claim: Unlawful Cutback of Accrued Benefits

Plaintiffs' third claim, the Unlawful Cutback Claim, is that the 2004 Cutback

---

[11] *Redmon* must be limited to its very specific facts because any broader ruling would in effect overrule *AK Steel* in this regard, which *Redmon* could not have done under *stare decisis* principles and the doctrine of interpanel accord.  *Grundy Mining Co. v. Flynn,* 353 F.3d 467, 479 (6th Cir. 2004).

[12] Because the Unlawful Investment Crediting Claim clearly relates back to the Unlawful Projection Claim asserted in the Original Complaint, the date of the Original Complaint is the relevant filing date for limitations purposes.  *See* Argument III.B below.

Amendment reduced the value of investment credits that had already accrued under the Plan as of the date of the amendment and was therefore an unlawful cutback of accrued benefits under § 204(g) of ERISA, 29 U.S.C. § 1054(g) ("The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan").  The claim is that is was unlawful for Allmerica to take away the 401(k) menu with respect to hypothetical contributions that had been made to employees' accounts through December 31, 2003, the day preceding the effective date of the 2004 Cutback Amendment.

**A.      The Unlawful Cutback Claim States a Valid Claim for Relief**

The Unlawful Cutback Claim follows directly from the Notice 96-8 "frontloading" principle discussed in the Background section above.  Applying that principle to the Plan, which Allmerica has conceded is frontloaded, each participant in the Plan as of December 31, 2003 had an "accrued benefit" under the Plan equal to the sum of her Account Balance plus future investment credits through age 65.  For example, an employee whose 65th birthday is December 31, 2035, had an accrued benefit as of December 31, 2003 equal to:

| **12/31/03 Accrued Benefit (Greater-of)** | = | 12/31/03 Account Balance | + | Greater of 2004 investment returns or 2004 Treasury rate | + | Greater of 2005 investment returns or 2005 Treasury rate | + ⋯ | Greater of 2035 investment returns or 2035 Treasury rate |
|---|---|---|---|---|---|---|---|---|

Even if the interest crediting rate in effect before 2004 had been simply the 401(k) menu rate (rather than the greater-of rate) as Allmerica contends, the employee's accrued benefit would,

at a minimum,[13] have been equal to:

| **12/31/03 Accrued Benefit (menu)** | = | 12/31/03 Account Balance | + | 2004 investment returns under 401(k) menu | + | 2005 investment returns under 401(k) menu | + ... | 2035 investment returns under 401(k) menu |

The 2004 Cutback Amendment purported to change the earnings crediting rate for periods after 2003.  Under the amendment, earnings credits were no longer determined by reference to returns on hypothetical investments in the Allmerica 401(k) Plan, but instead were based solely on the 30-year Treasury rate.  FAC. ¶¶ 57, 69.  This resulted in a forfeiture of a portion of each participant's accrued benefit under the Plan.  *Id.*, ¶¶ 69-74. On New Years' Eve December 31, 2003, each participant had an accrued benefit under the Plan represented by one of the equations immediately above.  On New Years Day January 1, 2004, the accrued benefit, according to the 2004 Cutback Amendment, had purportedly morphed into the following:

| **1/1/04 Accrued Benefit** | = | 12/31/03 Account Balance, equal to 12/31/02 balance plus interest for 2003 at greater-of rate | + | 2004 Treasury rate | + ... | 2035 Treasury rate |

This January 1, 2004 accrued benefit is unambiguously smaller than the December 31, 2003 accrued benefit determined under the required "greater-of" formula.  It also is less valuable than the December 31, 2003 accrued benefit determined under the "straight" 401(k) menu formula favored by Allmerica, because a stream of future earnings credits from hypothetical 401(k) plan investments is – or *could* be, which is all that matters – more valuable than a stream of future interest credits determined at the 30-year Treasury rate.  FAC. ¶ 58.  As a

---

[13] Even if the "greater-of" rate did not apply before 2004, it certainly would have kicked in (with respect to December 31, 2003 account balances) effective January 1, 2004, the effective date of the Cutback Amendment, because the amendment expressly promised an interest rate equal to the 30-year Treasury rate. Two interest crediting rates therefore applied to employees' account balances accrued as of December 31, 2003: (1) the 401(k) menu rate promised at the time each hypothetical contribution was made before 2004, and (2) the 30-year Treasury rate promised under the Plan as of January 1, 2004. The only way for the Plan to satisfy both commitments is to credit whichever rate is higher. *See* FAC ¶ 59. *Compare* Def. Mem. at 13, n.7, which fails to take into account the Plan's "frontloaded" commitment to credit earnings under the 401(k) menu for "contributions" made before 2004.

result, the 2004 Cutback Amendment unlawfully reduced the accrued benefit for each

employee with a hypothetical account balance as of December 31, 2003.[14]

Proposed Treasury Regulations published in 2007 confirm Plaintiffs' interpretation.

According to the regulations:

> to the extent benefits have accrued under the terms of a [cash balance] plan that
> entitle the participant to future interest credits, ***an amendment to the plan to
> change the interest crediting rate*** for such interest credits violates section
> 411(d)(6) [of the Code, the parallel to section 204(g) of ERISA] if the revised
> rate *under any circumstances could* result in a lower interest crediting rate as of
> any date after the applicable amendment date of the amendment (within the
> meaning of § 1.411(d)-3(g)(4)) changing the interest crediting rate.

Prop. Treas. Reg. § 1.411(b)(5)-1(d)(8) (emphasis added).  These regulations, which are

consistent with the IRS's long-standing position that future interest credits are part of a cash

balance plan participant's protected "accrued benefit," are entitled to deference.  *See Smiley v.*

*Citibank (S.D.), N.A.,* 517 U.S. 735, 744 n.3 (1996) (deferring to regulations published after the

transactions at issue occurred because "it would be absurd to ignore the agency's current

authoritative pronouncement of what the statute means").

Allmerica contends that there was no reduction in accrued benefits because the 2004

Cutback Amendment only took away a *future* opportunity to make investment selections, not

Investment Credits that had already accrued.  Def. Mem. at 20.  This is just another way of

---

[14] *See also Heinz,* 541 U.S. at 746 (amendment reducing the value of accrued benefits violates ERISA
§ 204(g)). Just as in *Heinz,* Allmerica's announcement in fall 2003 of its pending adoption of the 2004
Cutback Amendment imposed a new condition that made each employee's accrued-to-date benefit
much less valuable:  (1) Take your money before December 31, 2003 (like Ms. Durand) and you get the
full value of your account balance projected to age 65 based on what your return would have been
under the 401(k) menu – effectively locking in the 401(k) menu through age 65; or (2) leave your
money in the Plan and after January 1, 2004 your account balance will grow at merely the 30-year
Treasury rate – and when you take a distribution, you will get a benefit based on you account balance
projected to age 65 using the 30-year Treasury rate instead of the 401(k) menu rate.  The imposition of
this new condition – take your money now or forfeit 401(k) menu returns through age 65 – was
unlawful.  *See* FAC ¶¶ 30, 68 (citing the Treas. Reg. § 1.411(a)-4 anti-conditioning rule); *Esden,* 229
F.3d at 157-58 ("part of her pension benefit [attributable to future interest credits] was made
conditional on the distribution option chosen, in violation of the anti-forfeiture provisions of ERISA
§ 203(a); I.R.C. § 411(a)(2) and Treas. Reg. § 1.411(a)-4").

saying that the Plan is not frontloaded – that a participant's "accrued benefit" is equal merely to his current Account Balance, *id.* at 19, and future Investment Credits are something an employee has the potential "opportunity" to earn in the future, rather than a benefit that is baked into the accrued benefit the employee has already earned.  Again, Notice 98-8 clearly provides, and Allmerica has conceded, otherwise.  *See supra* at 17-18.[15]  The Plan is a cash balance defined *benefit* pension plan under which future interest credits are necessarily part of each participant's accrued benefit – not a 401(k) defined *contribution* plan under which a participant's accrued benefit is his account balance and future interest credits have not yet been earned.  *See Esden,* 229 F.3d at 158-59

As a threshold matter, Allmerica's fall-back argument is equally unserious.  Maybe the Plan did promise to credit interest in the future, Allmerica seems to argue, but we did not promise "any particular *form* of interest crediting."  Def. Mem. at 19 (emphasis added).  And even if we did promise a particular form, "the **form** of the interest credits is **not** a benefit protected by ERISA," which means we could change the plan's interest rate formula to any formula or rate of our choosing at any time.  *Id.* at 20 (citing Treas. Reg. § 1.411(d)-4, Q&A-1(d); emphasis in original); *id.* at 21 (citing Plan provision permitting Allmerica to change the "specific investment choices").

As a threshold matter, Allmerica's reliance on Treasury Regulation § 1.411(d)-4,

---

[15] Allmerica contends that future Investment Credits are not part of a participant's accrued benefit because (1) the Plan's terms are controlling and (2) "the Plan defines 'accrued benefit' as 'the sum of a Participant's Account Balance.'"  *Id.*  This ignores that (1) Plan terms control only to the extent they comply with ERISA, *see West v. A.K. Steel,* 484 F.3d at 405, 29 U.S.C. § 1104(a)(1)(D), and (2) as a result, "[t]he requirements referred to in [Notice 96-8] apply even in the case of a cash balance plan that defines an employee's accrued benefit as an amount equal to the employee's hypothetical account balance."  Notice 96-8, Sec. III.C.  Accordingly, even if a cash balance plan purports to define the accrued benefit as merely a participant's current account balance, it does not change the fact that the accrued benefit to which participants have an indefeasible right *under the law* is the benefit at normal retirement age, which includes future investment credits.  *Id.  See also* Mtn. to Dism. Orig. Compl. at 15 ; Reply in Supp. of Mtn. to Dism. Orig. Compl. at 9-10 (recognizing "pension plans governed by ERISA must incorporate provisions implied by law").

Q&A-1(d) is misplaced.  The regulation provides that employees do not have a right to direct "investments" or the right to a particular form of "investment."  Applying the regulation, *Thompson v. Ret. Plan for Employees of S.C. Johnson & Sons, Inc.*, 663 F.Supp.2d 700 (E.D. Wis. 2009), cited at Def. Mem. 19, held that pension plan participants did not have a right to force the plan's trustee to maintain a particular allocation of assets that the participants believed would produce the highest possible returns.  *Id.* at 707-708.  Among the reasons for the *Thompson* court's holding was that locking a pension plan trustee into a particular portfolio or asset mix would conflict with the trustee's strict fiduciary duty to invest assets prudently. *Id.* at 708.  That concern is not present here because Allmerica Plan participants never had the power, and do not seek, to instruct the trustee how to actually invest Plan assets.  Participants in the Plan are permitted merely to identify *hypothetical* portfolios that will be used to calculate *notional* investment credits to their accounts.  *See, e.g.,* Mtn. to Dism. Orig. Compl. (Doc. 13) at 1-2.  The Allmerica Plan trustees can and do actually invest Plan assets in real market investments without restriction.  The regulations and *Thompson* accordingly are inapplicable here.

Allmerica's citation to the Plan provision permitting it to change the "specific investment choices" is a red herring.  There is no dispute that Allmerica, acting through its board of directors, could change the specific investment choices offered under the 401(k) menu, provided the Plan continued to include a menu of hypothetical investment options no less diversified than the menu in place at the time the underlying compensation credits were allocated.  FAC ¶ 25.  But the ability to change the particular menu offerings did not, and could not under ERISA, allow Allmerica to strip out the 401(k) *menu* altogether and replace it "with a single investment rate."  Def. Mem. at 21.  This violates not only the explicit terms of the Plan – a single rate is not a "menu" from which participants can make "choices" – but

would render the bedrock Notice 96-8 "frontloading" principle wholly illusory.  If future earnings credits are part of an employee's benefit – which they unquestionably are under the Plan – but the rate is subject to change at the Plan sponsor's whim, has anything really accrued?  According to Allmerica's theory, it could have replaced the 401(k) menu with a "single investment rate" equal to .000001%, effectively zero.  This can't be right.  It is no different than saying the Plan was not frontloaded – that future interest credits were not promised at any particular rate, which means they were not promised at all.  But that argument is simply not available here:  the Plan is frontloaded.  *See supra*, pp. 14-15.[16]

The reality is, Allmerica did promise to continue to provide Investment Credits, for as long as a participant's Account remained in the Plan, using to the same investment menu offered under the Allmerica 401(k) Plan.  Although the 401(k) Plan menu does not appear explicitly in the terms of the formal Plan document, it is incorporated by reference into the Plan via the Summary Plan Descriptions provided to participants, as Defense counsel acknowledged during oral argument before the Sixth Circuit:

> participants have the right to choose market-based investments. And if you look
> at the list, it's in the summary plan description.

Appeal Oral Arg. Tr:  24: 4-8.  *See also* Def. Appeal Mem. at 12 (referring to SPD menu) and Def. Mem. at 2, 8 (same).  The 401(k) Plan menu was first incorporated by the 1995 SPD (p. 5 and Appendix A) and then reinforced in formal and informal participant communications every year thereafter.  *E.g.,* 1997 Summary of Material Modifications ("SMM") (Ex. 3); 1999 SMM

---

[16] Notice that Defendants do *not* argue that the 401(k) investment credits were *not* frontloaded.  That is because, in addition to being inconsistent with their previous concessions and the opinions in *Durand I* and *II*, Defendants know they would merely be trading in a whipsaw liability for a far more expensive *backloading* liability, as Plaintiffs expressly allege in FAC ¶ 21.  *See, e.g., Berger,* 338 F.3d 762 ("To be tax-qualified**,** a cash balance plan must be 'frontloaded,' IRS Notice 96-8. . . .  Otherwise [such plans would be impermissibly backloaded]"); *Eaton v. Onan Corp.*, 117 F.Supp.2d 812, 843-45 (S.D. Ind. 2000) (finding backloading violation adequately alleged arising out of partially non-frontloaded interest credit).

(Ex. 4).

After several years of representations to Plan participants that the Cash Balance Plan investment menu was the same as the 401(k) Plan menu, with never even a hint that the menus might diverge in the future, the 401(k) Plan menu became an integral part of the Plan, the same as if written into the Plan document itself. *See Morrison,* 439 F.3d at 301-02 (Sixth Circuit "case law instructs us to read the SPD and the Plan documents together as an integrated whole when there is no conflicting language"), *citing Wendy's Int'l, Inc. v. Karsko,* 94 F.3d 1010, 1013 (6th Cir. 1996) and *Musto v. American Gen. Corp.,* 861 F.2d 897 (6th Cir. 1988); Treas. Reg. § 1.411(d)-4, Q&A-1(c)(1) ("if an employer establishes a pattern of repeated plan amendments providing for similar benefits in similar situations for substantially consecutive, limited periods of time, such benefits will be treated as provided under the terms of the plan"); Rev. Rul. 92-66, 1992-2 CB 92 ("the regulations preclude a pattern of plan amendments that would make benefits available only for a limited period of time if the plan amendments give rise to a reasonable expectation that the benefit is an ongoing feature of the plan, and therefore a valuable right").

Indeed, to read the Plan, SPD and SMM provisions as locking in the 401(k) Plan menu as the Cash Balance Plan menu is the only way the Plan is able to satisfy the requirement that the benefit formula – of which future interest credits are an integral part, as illustrated above – be "definitely determinable" and not subject to impermissible employer discretion. *See* Reply in Supp. of Mtn. to Dism. Orig. Compl. at 12 ("ERISA most certainly requires that all Plan benefits be definitely determinable. Treas. Reg. § 1.401-1(b)(1)(i) and IRS Rev. Ruls. 72-97, 1972-1 C.B. 106, and 69-427, 1969-2, C.B. 87"); *id.* at 2 ("Plan was required to be 'definitely determinable' and to avoid employer discretion); Mtn. to Dism. Orig. Compl. at 4 ("The Plan, which was required to select a formula that precludes employer discretion"); Code

§ 401(a)(25) (definitely determinable requirement; benefit formula must "preclude[] employer

discretion"); Treas. Reg. § 1.411(d)-4, Q&A-4(a) ("a plan that permits the employer, either

directly or indirectly, through the exercise of employer discretion, to deny a participant a

section 411(d)(6) protected benefit . . . violates the requirements of section 411(d)(6)");

*Perreca v. Gluck,* 295 F.3d 215, 228 (2d Cir. 2002) ("In other words, a pension plan may not

contain a provision that grants the employer discretion to deny a protected, accrued benefit").

Allmerica's position that it was not locked into any particular "form" of interest credits – *i.e.,* a

crediting formula tied to a 401(k) menu – is thus simply not credible.

      The IRS has clearly rejected Allmerica's position in materially indistinguishable cases.

*See* Danaher letter at 3-4 ("Even though the rates under participant-directed investments cannot

be determined in advance, they can still be definitely determinable *if fully defined*" and not

subject to change at the employer's unfettered discretion (emphasis added)).  Here, Allmerica

"fully defined" the investment crediting rate under the Plan by specifying (via the SPDs) a

definitely determinable formula under which investment credits could be determined without

the exercise of unfettered discretion by the company:  Investment Crediting Rate = return on

the hypothetical portfolio elected by each participant from among the menu of options offered

under the Allmerica 401(k) Plan.[17]  Allmerica was not at liberty to change any aspect of this

formula with respect to benefits in the Plan that had already accrued.[18]

---

[17] Allmerica had discretion under the 401(k) Plan to replace poorly-managed funds with alternative funds if and when such funds became objectively imprudent options.  Had Allmerica materially altered the range of funds offered under the 401(k) Plan or terminated that plan, the Cash Balance Plan would have been required to maintain a hypothetical menu based on the 401(k) menu in place as of the date of the 401(k) Plan's modification or termination. *See, e.g.,* Danaher letter at 3-4; FAC ¶ 25 ("broadly-diversified menu of hypothetical investment options no less favorable to participants than the menu in place at the time each compensation credit was allocated").

[18] *See, e.g., Thompson v. Retirement Plan of the Employees of S.C. Johnson & Sons, Inc.*, No. 2:07-cv-01047-JPS (E.D. Wis.), Doc. 102, JDI Plan Ans. ¶ 44 (equity-based earnings credit replaced with the yield on a Treasury security but only for benefits accrued *after* the date of the change; the equity-based

As Judge Michael Mukasey told PricewaterhouseCoopers, the consulting firm that designed Allmerica's Plan to mirror its own cash balance plan, FAC ¶ 40:

> The [plan's] use of participant-chosen investments as the method of determining the value of the interest credits does not change the requirement that such interest credits be calculated as a benefit promised under the plan.

*Laurent v. PricewaterhouseCoopers, LLP,* 448 F. Supp.2d 537, 549 (S.D.N.Y. 2006) (requiring whipsaw calculation).  In other words, a cash balance plan is not somehow exempt from the rule that future earnings credits are part of an employee's ERISA-protected accrued benefit just because the plan uses "participant-chosen investments as the method of determining" the crediting rate.  To conclude otherwise would be to introduce a "loophole" in the way ERISA defines a cash balance plan participant's accrued benefit.  *Id.*  The 401(k) menu unambiguously was part of each employee's accrued benefit.  The 2004 Cutback Amendment, which purported to eliminate the menu, therefore was unlawful.  *See* ERISA § 204(g), 29 U.S.C. § 1054(g).

## B.      The Unlawful Cutback Claim is Timely

The Unlawful Cutback Claim is timely even assuming a five year limitations period because it plainly relates back to the date of the filing of the original Complaint, March 9, 2007, which was well within the effective date of the 2004 Cutback Amendment.  As should be evident from the discussion and depictions of the accrued benefit formulas above, the Unlawful Cutback Claim is merely a variant of the Unlawful Projection Claim and clearly arises from the same conduct, transaction, or occurrence.  Fed. R. Civ. P. 15(c)(2).  The premise underlying both claims is that because the Plan is a "frontloaded" interest crediting plan within the meaning of Notice 96-8, future Investment Credits are embedded in each participant's "accrued benefit."  The Unlawful Projection Claim asserts that the *methodology*

---

rate was preserved for benefits accrued as the date of the amendment).

*actually used by Allmerica to calculate benefits*, by understating the value of these accrued

future Investment Credits, resulted in a forfeiture of a portion of each participant's benefit at

the time of each benefit distribution, in violation of ERISA § 203(a), 29 U.S.C. § 1053.  The

Unlawful Cutback Claim asserts that *the 2004 Cutback Amendment* in one fell swoop caused a

forfeiture of accrued future Investment Credits on January 1, 2004, in violation of ERISA

§ 204(g), 29 U.S.C. § 1054(g).  Each Claim addresses the forfeiture of future Investment

Credits – the only difference being how the forfeitures were implemented.

> Indeed, so closely-related are the claims that Ms. Durand believed – and still believes –

that the Unlawful Cutback Claim was adequately pled in the Original Complaint.  As noted in

the Introduction, in the Original Complaint, Ms. Durand intentionally cast a wide net with the

proposed class definition, which she described as:

> All persons who participated in the Allmerica Cash Balance Pension Plan who
> vested or will vest in an accrued benefit under the Plan's cash balance formula
> between January 1, 1995 and December 31, 2004; and the beneficiaries and
> estates of such persons.

Orig. Compl. ¶ 30.  The inclusion in this definition of participants who accrued benefits in

2004, and of participants who received distributions in 2004 and later years – after the effective

date of the Cutback Amendment – make sense only if it is assumed that the 2004 Cutback

Amendment was ineffective in its attempt to eliminate Investment Credits after January 1,

2004.  If the interest crediting rate after January 1, 2004 was the 30-year Treasury rate,

participants receiving a distribution after that date would not have had a whipsaw claim at all.

Implicit in the Original Complaint, then, was an allegation that the 2004 Unlawful Cutback

Claim was unlawful and therefore not operative.  Indeed, Allmerica recognized exactly this in

its Answer to the Original Complaint, in which it asserted in its Seventh Defense that:

> The claims of the **class members plaintiff purports to represent who
> received lump sum distributions after December 31, 2003** are barred due to

> an amendment to the Plan which provided for interest crediting at the same rate
> as the Internal Revenue Code Section 417(e) discount rate.

Def. Ans. at 16 (emphasis added). The Unlawful Cutback Claim is set forth as a separate

claim in the Amended Complaint to avoid doubt and add additional named Plaintiffs who

are more appropriate class representatives.[19]

Allmerica is incorrect that the addition of additional named plaintiffs renders the

relation-back principle inoperative.  Although the Sixth Circuit appears not to have spoken

directly on the subject, other federal courts to have consider the issue have concluded that

"[t]he history of the Rules makes clear . . . that Rule 15 was meant to be generally applicable to

a proposed change of plaintiffs."  *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106

F.3d 11, 19 (2d Cir. 1997).  As recognized by the Eleventh Circuit, "[t]his extension of Rule

15(c)(3) to amendments involving plaintiffs rests on solid ground. When Rule 15(c) was

amended in 1966, the advisory committee wrote:

> The relation back of amendments changing *plaintiffs* is not expressly treated in
> revised Rule 15(c) since the problem is generally easier.

Fed. R. Civ. P. 15 advisory committee's note to the 1966 Amendment."  *Cliff v. Payco Gen.*

*Am. Credits, Inc.*, 363 F.3d 1113, 1131-32 (11th Cir. 2004) (emphasis added) (citing cases

from the Second, Third, Fifth and Ninth Circuits in accord).

The district court case cited by Allmerica, *In re ARM Fin. Group, Inc. Sec. Litig.*, No.

3:99-CV-539-H, 2002 WL 1586397, at *5 (W.D. Ky. Jul. 18, 2002), appears to have

misconstrued *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996), which addressed the

addition of a new *defendant*, a completely different situation because of the seriousness and

---

[19] Ms. Durand clearly had standing to assert the Unlawful Cutback Claim in the Original Complaint on
behalf of class members she seeks to represent, even though she was not personally injured by the 2004
Cutback Amendment.  *See, e.g., Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422 (6th Cir. 1998);
*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009).

inherent surprise in being named a new defendant.  It is unlikely the Sixth Circuit would

support *In re ARM*'s extension of the "no new defendant" rule to create a *per se* "no new

plaintiff" standard.  According to the Sixth Circuit, the relation-back principle "must be

interpreted in light of the 'fundamental tenor of the Rules,' which 'is one of liberality rather

than technicality."  *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 516 (6th Cir.

2007).  *Accord Hall v. Spencer County, Ky.*, 583 F.3d 930 (6th Cir. 2009) (reversing district

court for failing to recognize amended complaint related back to original filing).

> The Court's approach thus has been more practical:
>
> the rule to be followed in federal courts is that if there is an identity between the
> amendment and the original complaint with regard to the general wrong suffered
> and with regard to the general conduct causing such wrong, then the amendment
> shall relate back and the statute of limitations would not avail to preclude a
> hearing on the merits

*Miller v. American Heavy Lift Shipping*, 231 F.3d 242, 251 (6th Cir. Ohio 2000) (quotation

marks omitted).  *Accord EJS Props., LLC v. City of Toledo*, 522 F. Supp. 2d 936, 941 (N.D.

Ohio 2007).  The key is fairness and lack of surprise: "whether the party asserting the statute of

limitations defense had been placed on notice that he could be called to answer for the

allegations in the amended pleading."  *U.S. ex rel. Bledsoe,* 501 F.3d at 516.  *See also Tiller v.*

*Atlantic C. L. R. Co.*, 323 U.S. 574, 581 (1945) ("There is no reason to apply a statute of

limitations when, as here, the respondent has had notice from the beginning that petitioner was

trying to enforce a claim against it because of the events leading up to the death of the

deceased in the respondent's yard").

Given the close relationships between the Unlawful Cutback Claim and the Unlawful

Projection Claim, Allmerica could hardly have been surprised by the amplification of Ms.

Durand's allegations.  In fact, Allmerica was *not* surprised.  The Sixth Circuit looks to

extrinsic evidence when making the assessment of whether the defendant had sufficient notice

of the plaintiff's claims.  *Bledsoe,* 501 F.3d at 516; *Miller,* 501 F.3d at 516-17.  On January 31, 2008 (about four years after the effective date of the 2004 Cutback Amendment), Plaintiffs' counsel made a settlement offer that specifically stated Ms. Durand's intention to continue to press the Unlawful Cutback Claim:

> [W]e are not in a position to accept that the Plan's discontinuation of the investment experience election crediting mechanism, effective January 1, 2004, eliminated participants' accrued right to take lump sums under no less favorable conditions than those existing prior to that date. With respect to account balances that existed as of December 31, 2003, the right to the Plan's 401(k)-style earnings crediting rate and to take a lump sum calculated based on that rate had accrued as of that date – taking it away by amendment was an illegal cutback under ERISA § 204(g) and IRC § 411(d)(6). The question is not a close one. Withdrawing the 401(k)-style menu with respect to benefits accrued after 2003, by contrast, was the sponsor's prerogative.

*See* Ex. 8; Gottesdiener Decl. ¶ 10.  This is proof positive that the Unlawful Cutback Claim is not time-barred.

## IV.  Claim Four: The 204(h) Notice Claim States a Valid Claim for Relief and is Timely

Plaintiffs' fourth claim, the 204(h) Notice Claim, also challenges the 2004 Cutback Amendment, but in a different way.  The Unlawful Cutback Claim alleges that the 2004 Cutback Amendment unlawfully reduced the rate of future interest credits that had *already accrued* with respect to compensation-based credits allocated before January 1, 2004 (*i.e.,* under the frontloading principle).  The 204(h) Notice Claim, on the other hand, relates solely to the interest crediting rate that applies with respect to compensation credits allocated in 2004, the year following the amendment and before compensation credits were discontinued on December 31, 2004.  Because compensation credits for 2004 had not, on the effective date of the 2004 Cutback Amendment, yet been "contributed" to participants' Accounts, interest credits with respect to those 2004 compensation credits had not yet accrued.  As a result, it would have been lawful to reduce the interest crediting rate applicable to 2004 compensation

42

credits (and future compensation credits had Allmerica not frozen the Plan), had Allmerica

provided proper notice about the prospective reduction.  But Allmerica failed to do so.

While Allmerica may have notified participants that the interest crediting rate was

going to change, effective January 1, 2004, to the 30-year Treasury rate, that was not

sufficient.  ERISA § 204(h), 29 U.S.C. § 1054(h), required Allmerica to describe not only the

*new* benefit or allocation formula, under the Plan as amended, but also "the benefit or

allocation formula *prior* to the amendment" – so that participants could have "determine[d] the

approximate *magnitude* of the expected reduction.  Treas. Reg. § 54.4980F-1, Q&A-11(a)(3)-

(4) (emphasis added).  The notice provided by Allmerica failed to satisfy this standard because,

while it informed participants what the new interest crediting rate would be beginning in 2004,

the notice neglected to accurately describe what Allmerica was taking away – an interest

crediting rate equal to the greater of the 401(k) menu rate or the 30-year Treasury rate.  As a

result, participants had no way of determining the approximate magnitude of the expected

reduction in their rate of benefit accrual under the 2004 Cutback Amendment, in violation of

ERISA § 204(h) and Treas. Reg. § 54.4980F-1, Q&A-11(a)(3)-(4).

Because Allmerica failed to issue a proper § 204(h) notice, the 2004 Cutback

Amendment was invalid and the terms of the Plan should have been applied as though the

amendment had not been adopted.  As a result, Plaintiffs Wharton and Tedesco and other

similarly-situated participants were and are entitled to an interest crediting rate on their entire

Account Balances, not merely on the balance accrued as of December 31, 2003, determined

under the pre-2004 "greater-of" interest rate formula.  The 204(h) Notice Claim is not time-

barred for the same reasons the Unlawful Cutback Claim was timely.

## V.   Claim Five: Fiduciary Breach Claim

Plaintiffs' fifth claim, the Fiduciary Breach Claim, focuses on the same question posed

by the Sixth Circuit panel to Defendants' counsel during oral argument:

> I guess, with all those things out there [*i.e.*, Notice 96-8, the Department of Labor IG Report, and the copious supporting case law], and certainly a lot of these calculations having been done during the time when that [disputed benefit calculation] provision was still in place, I mean, why does the administrator have to wait for Jennifer Durand to come with a claim in order to follow the law?  * * * ***Or at least look at that issue already?***

Ex. 1, Tr. 37: 2-10, Oral Arg., *Durand v. Hanover* 37:2-10 (emphasis added).  Plaintiffs'

claim is that the Plan Administrator's failure to, at a minimum, "look at that issue

already," was a breach of the Administrator's duty to employees.

### A.     The Fiduciary Breach Claim States a Valid Claim for Relief

The Fiduciary Breach Claim is concisely summarized in paragraph 85 of the

Amended Complaint:

> The Company, acting in its role as Plan Administrator, breached its fiduciary duties under ERISA § 404(a) when it interpreted and applied the provisions of the Plan and SPD without independently assessing whether the account balance and accrued benefit calculation provisions of the Plan complied with ERISA. Instead of fulfilling its responsibility under the Plan and the SPD and ERISA to independently analyze these provisions to ensure that its application of the Plan and SPD provisions were consistent with ERISA, the Plan Administrator acted recklessly, failed to exercise its responsibilities honestly and/or in good faith, and/or failed to perform its duties with the requisite loyalty and prudence and regard for the legality of its actions required of an ERISA fiduciary.

FAC ¶ 85.  *See Kuper v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1995) ("a fiduciary may only

follow plan terms to the extent that the terms are consistent with ERISA").  Other paragraphs

of the Complaint paint a detailed story, with specific examples set out in chronological order,

illustrating the pattern of behavior that Plaintiffs' breach of duty claim is focused upon.  *See*

FAC ¶¶ 37-48, 50-51, 86-90.

Given the level of detail set forth in the Complaint regarding the Fiduciary Breach

Claim, Defendants' contentions that the Complaint's purportedly "scant" allegations "fail to

provide defendants or the Court with adequate notice of the bases for the claim," Def. Mem. at

23, 26, fail to "identify[] the correct defendant," *id.* at 26, and "for which time period they are being pursued and which fiduciary duty 'defendants' supposedly breached," *id.* at 27, are baseless.  If anything, Plaintiffs went overboard.  *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (ERISA fiduciary breach case; "Rule 8 does not . . . require a plaintiff to plead 'specific facts' explaining precisely how the defendant's conduct was unlawful. *Erickson v. Pardus*, 551 U.S. 89, 93 [] (2007) (per curiam). Rather, it is sufficient for a plaintiff to plead facts indirectly showing unlawful behavior, so long as the facts pled 'give the defendant fair notice of what the claim is and the grounds upon which it rests,' *id.* (quoting *Twombly*, 550 U.S. at 555) [], and 'allow[] the court to draw the reasonable inference' that the plaintiff is entitled to relief.  *Iqbal*, 129 S. Ct. at 1949").

    In addition to challenging the manner in which the Fiduciary Breach Claim was pled, Allmerica also asserts that the claim is really nothing more than "re-cast" claims for benefits that Plaintiffs are otherwise pursuing under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). It is not.  Although what Plaintiffs ultimately are most interested in is receiving the pension benefits they lost as a result of Allmerica's failure to apply the terms of the Plan in a manner compliant with ERISA – as was the Plan Administrator's duty, *see* ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D); *Durand II* at 442 – that is what pension plan participants suing for fiduciary breach almost *always* are most interested in.  But the reason Plaintiffs amended their Complaint to add an express claim (based on many of the same facts alleged in the original Complaint) for fiduciary breach is that – after reading Defendants' briefs and listening to the Sixth Circuit oral arguments – Plaintiffs expect to seek a remedy for the Plan Administrator's malfeasance that goes beyond a mere recalculation of benefits.  The primary remedy Plaintiffs expect to seek to address the Plan Administrator's breaches of fiduciary duty is an *injunction* prohibiting the Administrator (Allmerica) from participating in any recalculation of benefits

that the Court may ultimately order in this case.  The Plan Administrator's egregious pattern of behavior over several years, and its confessions that it has *no idea* how to calculate benefits under the Plan in a manner consistent with ERISA, *see, e.g.,* Doc. 11 at 4-5, aptly demonstrate that removing Allmerica as the Plan Administrator and replacing the Company with an independent fiduciary may be warranted.  *See Chao v. Employee Res. Mgmt.*, Case No.:2:06-cv-12503-NGE-DAS, 2007 WL 4245390,  (E.D. Mich. Nov. 29, 2007) ("removal of pension fund trustees and the appointment of a person to serve in their stead is appropriate under [ERISA] when they have engaged in repeated or substantial violation[s] of [their] responsibilities"); *Chao v. Hall Holding Co.*, 285 F.3d 415, 444 (6th Cir. 2002).[20]

Because removal of the Plan Administrator would be an equitable remedy available only under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and not § 502(a)(1)(B), Plaintiffs should be permitted to pursue their Fiduciary Breach Claim in addition to their claims for benefits.  *E.g.*, *Tackett v. M&G Polymers, USA, Inc.*, 561 F.3d 478, 491 (6th Cir. 2009) (Sixth Circuit allows plaintiffs to bring claims under both §§ 502(a)(3) and 502(a)(1)(B) "when § 502(a)(1)(B) would not provide the complete relief" plaintiff seeks, *e.g.*, benefits and injunctive relief); *Gore v. El Paso Energy Corp. LTD Plan*, 477 F.3d 833, 839-40 (6th Cir. 2007) (same).

Defendants' only defense on the merits to the Fiduciary Breach Claim is their

---

[20] Plaintiffs do not seek benefits or any other damage award under ERISA § 102, 29 U.S.C. § 1022. *See* Def. Mem. at 28. Rather, the allegations regarding shortcomings in the SPDs and other disclosures support Plaintiffs' claim that the Plan Administrator breached its fiduciary duties under ERISA § 404(a), 29 U.S.C. § 1104(a), by making materially false and misleading statements and omissions to participants, *see, e.g., Osberg v. Foot Locker, Inc.*, 656 F.Supp.2d 361, 370-71, 373-75 (S.D.N.Y. 2009), and for that reason should be disqualified from any recalculation benefits that may ultimately be ordered by the Court. Allmerica's acknowledgment on page 29 of its brief that it did not disclose the manner in which benefits were actually calculated because the Plan's calculation method was "pointlessly circular" illustrates what Plaintiffs are talking about.  Employees were entitled to know that the Plan used a pointlessly circular method to calculate benefits instead of an ERISA-compliant method that took into account the value of projected future investment credits.

contention that the Plan Administrator did not *have* a duty to independently assess whether the

Plan's investment crediting and projection provisions were inconsistent with ERISA.  *See* Def.

Mem. at 30-31, quoting Plan § 13.05.   But § 13.02 of the Plan ("General Fiduciary Duties")

specifically says the Administrator did have such a duty:

> **Each Plan Fiduciary** shall discharge his or her duties solely in the interest of the
> Participants and their Beneficiaries and act . . . in accordance with the documents
> and instruments governing the Plan *insofar as such documents and instruments are*
> *consistent with the provisions of current laws and regulations*.

Plan § 13.02(iv) (emphasis added).  *See also* ERISA § 404(a)(1)(D), 29 U.S.C.

§ 1104(a)(1)(D) (which imposes the duty to second-guess plan provisions regardless of what

the plan provides).   Allmerica previously acknowledged that this Plan provision required the

Plan Administrator to second-guess the legality of the Plan's benefit calculation methodology

and to override those provisions if necessary to comply with ERISA.  *See* Reply in Support of

Mtn. to Dismiss (Doc. 18) at 10 (quoting Plan § 13.02(iv)); Def. Appeal Mem. at 29 (same).

Apparently, Defendants "forgot" that section 13.02 existed when they cited only section 13.05

to the Court this time around.  Def. Mem. at 31.

### B.       The Fiduciary Breach Claim is Timely

Allmerica contends that "certain" aspects of the Fiduciary Breach Claim are barred by

the special statute of limitations applicable to ERISA breach-of-duty claims, ERISA § 413, 29

U.S.C. § 1113.  *See* Def. Mem. at 25.  However, just as with Plaintiffs' benefit claims above,

Plaintiffs could not file a lawsuit alleging that the Plan Administrator had failed to second

guess or disclose that it had been uncritically applying Plan provisions calling for use of the

30-year Treasury rate to project employee's account balances to age 65 – or for the use of an

investment crediting rate that failed to take into account the floor inherent in the 30-year

Treasury projection rate – if Plaintiffs did not know the Plan Administrator was applying these

provisions.  Indeed, ERISA § 413 provides specifically "that in the case of fraud or

concealment, [an action for fiduciary breach] may be commenced not later than six years after

the date of discovery of such breach or violation."  Allmerica concedes that it concealed the

very *existence* of the 30-year Treasury rate under the terms of the Plan:

> Rather than describe, as the Plan itself does, the projection rate forward [at the
> 30-year Treasury rate] (and, to be complete, the projection rate back), the SPD
> disclosed that upon taking a lump sum payment, a participant will "receive the
> dollar value of your account . . . ."

Def. Mem. at 29.  Because, through no fault of their own, none of the Plaintiffs

discovered the alleged breaches of the Plan Administrator's fiduciary duties until Ms.

Durand retained counsel in 2007, the Fiduciary Breach claim is timely.[21]

## CONCLUSION

For the foregoing reasons and such other reasons as may appear to the Court, Plaintiff

respectfully requests that the Court deny Defendants' motion to dismiss.


Dated:  March 2, 2010                        Respectfully submitted,


                                             /s/ Eli Gottesdiener
                                             Eli Gottesdiener (admitted *PVH*)
                                             GOTTESDIENER LAW FIRM, PLLC
                                             498 Seventh Street
                                             Brooklyn, NY  11215
                                             Phone: (718) 788-1500
                                             Fax:    (718) 788-1650

                                             E. Douglas Richards
                                             E. DOUGLAS RICHARDS PSC
                                             619 Cooper Drive
                                             Lexington, KY 40502
                                             (859) 269-1974

---

[21] Because the Fiduciary Breach Claim clearly relates back to the Unlawful Projection Claim asserted in the Original Complaint, the date of the Original Complaint is the relevant filing date for limitations purposes.  *See* Argument III.B, *supra*.

*Counsel for Plaintiffs and the proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2010, I caused the foregoing to be served via the ECF

system to the following:

Alan S. Gilbert
Jeffrey S. Davis
Sonnenschein Nath & Rosenthal LLP
7800 Sears Tower
233 S. Wacker Drive
Chicago, Il  60606
agilbert@sonnenschein.com
jdavis@sonnenschein.com

Stephen J. O'Brien
Sonnenschein Nath & Rosenthal LLP
One Metropolitan Square, Suite 3000
St. Louis, MO  63102
sobrien@sonnenschein.com

Richard H.C. Clay
Angela Logan Edwards
Lisa D. Hughes
Woodward, Hobson & Fulton, LLP
2500 National City Tower
101 South Fifth Street
Louisville, KY  40202
AEdwards@whf-law.com
lhughes@whf-law.com

_____ /s/Eli Gottesdiener