UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:07-CV-00130-HBB

JENNIFER A. DURAND,
On behalf of herself and on
Behalf of all others similarly situated                                              PLAINTIFFS


VS.


THE HANOVER INSURANCE GROUP, INC.,
And THE ALLMERICA FINANCIAL CASH
BALANCE PENSION PLAN                                                              DEFENDANTS


MEMORANDUM, OPINION,
AND ORDER

BACKGROUND

Before the Court is a motion to compel production of allegedly privileged documents and

submission of more complete privilege logs filed by Plaintiffs (DN 168, 170; DN 169 Sealed

Document).  Defendants, the Hanover Insurance Group, Inc. and the Allmerica Financial Cash

Balance Pension Plan (collectively "Defendants"), have filed a memorandum in opposition (DN

173).  Plaintiffs have filed a reply memorandum in support of her motion (DN 175).

Pursuant to orders (DN 182, 202), Defendants have submitted directly to the undersigned

the documents at issue for *in camera* review (DN 185, 189, 203).  Additionally, Defendants have

filed a notice indicating withdrawal of a privilege claim regarding a specific document submitted

for *in camera* review (DN 204).  This matter is ripe for determination.

## FINDINGS OF FACT

Plaintiffs in this ERISA class action lawsuit are former employees of Defendant Hanover Insurance Group, Inc. ("Hanover"), and participants in its pension plan, The Allmerica Financial Cash Balance Pension Plan (the "Plan"), which is also named as a Defendant (DN 1, 46). Durand v. Hanover Ins. Group, Inc., No. 3:07-CV-130-JDM, 2013 WL 6633961, at *1 (W.D.Ky. Dec. 17, 2013).   Hanover has provided the Plan for its employees since 1995.   Durand v. Hanover Ins. Group, Inc., 806 F.3d 367, 371 (6th Cir. 2015) (citations omitted) ("Durand II").

The Plan belongs to a subset of defined-benefit pension plans, known as "cash-balance" plans.  Durand v. Hanover Ins. Group, Inc., 560 F.3d 436, 437 (6th Cir. 2009) (citing ERISA § 3(35), 29 U.S.C. § 1002(35)) ("Durand I").   A cash-balance plan creates for bookkeeping purposes a hypothetical account for each participant.  Id. (citing West v. AK Steel Corp., 484 F.3d 395, 399 (6th Cir. 2007)).   On paper, these hypothetical accounts look much like a traditional 401 (k) account.   Id.   "Each participant's account is funded by hypothetical allocations, called 'pay credits,' and hypothetical earnings, called 'interest credits,' that 'are determined under a formula selected by the employer and set forth in the plan.'"  Durand I, 560 F.3d at 437 (quoting I.R.S. Notice 96-8, 1996-1 C.B. 359).

"Interest credits, which are at issue in this case, are the earnings attributable to the account balance over time."  Durand II, 806 F.3d at 371 (citing AK Steel, 484 F.3d at 399). "The formula for calculating interest credits may provide for a fixed rate of return on the account balances, or it may use a variable rate tied to an identified index.  Id.

The Sixth Circuit recently provided the following explanation of how interest credits were calculated in the Plan:

> From 1995 until early 1997, the Plan provided a fixed rate of
> return of six percent.  Then, from 1997 until the 2004 Amendment,

> the Plan allowed members to select hypothetical investment
> options from a "broadly diversified menu" described in Plan
> documents, including "an Allmerica stock fund and a wide variety
> of domestic and international equity funds, corporate and United
> States government bond funds, and a fixed interest fund and
> money market fund." (R. 46, Amended Complaint, PageID 623.)
> Each member's interest credits were calculated based on the actual
> performance of the investment options he or she had selected. As
> mentioned above, the 2004 Amendment eliminated the menu of
> investment options and provided that all interest credits would be
> indexed to the 30-year Treasury bond rate.

Durand II, 806 F.3d at 371.

Under a cash-balance plan, "the pay credits cease at the time of employment separation;
however, separated employees continue to earn interest credits, which accrue to the hypothetical
account until the normal retirement age of 65." Durand v. Hanover Ins. Group, Inc., No. 3:07-
CV-130-JDM, 2011 WL1302227, at *1 (W. D Ky. Mar. 31, 2011). "The pension benefit is,
therefore, the value of the hypothetical account balance at normal retirement age and is known as
the participant's 'accrued benefit.'" Id. (citing Durand I, 560 F.3d 437-38; ERISA § 3(23)(A),
29 U.S.C. § 1002(23)(A)).

Under the Plan, employees who left their employment with Hanover could choose either
to continue participation in the Plan, in which case they would receive an annuity based on their
accrued benefits once they reach the retirement age of 65, or they could cash out their benefits
and receive a lump sum. Durand II, 806 F.3d at 371 (citation omitted). As the Sixth Circuit
explained in Durand I:

> A departing employee cannot be penalized for choosing the lump-
> sum distribution; thus, "[t]o comply with ERISA, lump-sum
> payments such as the one[ ] received by [Durand] in the present
> case must be the *actuarial equivalent of the normal accrued
> pension benefit.*

560 F.3d at 438 (citing AK Steel, 484 F.3d at 400) (emphasis in original).

Prior to 2006[1], cash-balance plans were required to use a two-step "whipsaw" calculation to determine the proper amount of the lump-sum distribution.  Durand I, 560 F.3d at 438 (citing AK Steel, 484 F.3d at 400).   The first-step was to project the participant's account balance forward to its value at the participant's normal retirement age of 65, "'*using the rate at which future interest credits would have accrued*' had the participant remained in the plan."   Id. (quoting AK Steel, 484 F.3d at 400 (emphasis added).   Thus, the first-step provided an estimation of the value of the participant's accrued benefit at age 65.  Durand II, 806 F.3d at 371. The second step involved discounting the projected amount back to its present value on the date of the actual lump-sum distribution.  Durand I, 560 F.3d at 438 (citing AK Steel, 484 F.3d at 400).

The Sixth Circuit has indicated the projection forward must include a "*fair estimate* of what the participant's future interest credits *actually would have been* had [the participant] retained a single-life annuity under the plan.  Id. (internal quotations and case citations omitted). "The 'fair estimate' is critical because, if the participant's future interest rate exceeds the discount rate, the participant's lump-sum distribution will be greater than [the participant's] hypothetical account balance at the time of the distribution."   Id. (citing AK Steel, 484 F.3d at 401).

1.  Audit by the Inspector General

In September 2000, the Department of Labor's ("DOL") Office of Inspector General ("OIG") commenced an audit of the DOL's Pension and Welfare Benefits Administration ("PWBA"), which administers Title I of ERISA (DN 1-3 p. 9; DN 169-14 p. 2).  The purpose of

---

[1] "The Pension Protection Act of 2006, Pub.L. No. 109-280, 120 Stat. 780 (2006) eliminated the 'whipsaw' requirement for lump-sum distributions made after August 17, 2006, permitting plans to rely directly on the balance of a hypothetical account to express the value of the accrued benefit."  Durand v. Hanover Ins. Group, Inc., 806 F.3d 367, 372 (6th Cir. 2015) (citation omitted).

the audit was to evaluate the adequacy of the PWBA's "oversight policy regarding defined benefit plans that have converted from traditional final average pay models to a cash balance model" (DN 169-14 p. 2).

In a letter dated May 31, 2001, the OIG advised the Plan's sponsor, First Allmerica Financial Life Insurance Company ("Allmerica"), that the Plan had been "judgementally [sic] selected" as part of the audit, and that the OIG would be visiting Allmerica's offices to "examine conversion implementations to verify that participants' accrued benefits were accurately calculated and conversion procedures complied with ERISA and plan documents" (DN 169-14 p. 2). The OIG requested documentation from Allmerica, including sample participant files demonstrating calculations of lump-sum distributions (DN 169-14 p. 2). Allmerica responded to the OIG's requests in July 2001 (DN 169-16).

Following Allmerica's compliance with the OIG's requests, the OIG sent a letter dated October 26, 2001, to Ms. Megan McCabe with Allmerica's Office of General Counsel (DN 169-3 p. 2-7). The letter explained that the attached NOTICE OF POSSIBLE REFERRAL presented the results of the OIG's review of materials related to the Plan (DN 169-3 p. 2-7). The letter asked Allmerica to review the OIG's conclusion/calculations and provide a response indicating its concurrence or non-concurrence, and any comments it wished the OIG to consider (DN 169-3 p. 2-7). Notably, the letter included the following paragraph:

> We wish to emphasize that the Office of Inspector General does not make official determinations regarding ERISA benefit plans and the attached NOTICE OF POSSIBLE REFERRAL does not represent an official position of the Department of Labor. However, the results of our review will be referred to management officials. Additional actions may be initiated as a result of that referral.

(DN 169-3 p. 2).

The introductory paragraph to the NOTICE OF POSSIBLE REFERRAL reads as follows:

> **The Office of Inspector General conclusion in this notice does not represent an official position of the Department of Labor, and no action is required as a result of this notice. Within the Department, official ERISA determinations are made solely by the Pension and Welfare Benefits Administration. However, the Office of Inspector General may refer this situation, including any comments you may provide, to the Pension and Welfare Benefits Administration for its determination.**

(DN 169-3 p. 4) (emphasis in original). Immediately below, the document states as follows:

> **CONCLUSION:** Based on our analysis of the material submitted to us, we beleve [sic] two sampled participants in the Allmerica Financial Cash balance Pension Plan may have suffered forfeitures of pension benefits in violation of ERISA §§203 and 205. Our analysis is outlined in the following sections.

(DN 169-3 p. 4) (emphasis in original). In the text of the document, the OIG explained, according to its calculations, the amounts paid by the Plan in two cases were less than the present values of the Normal Retirement Benefit as of the Normal Retirement Date (DN 169-3 p. 4). For this reason, the OIG believed there was a potential violation of ERISA §§203 and 205 (DN 169-3 p. 4).

In a letter dated November 30, 2001, Leslie A. Klein, an attorney with the law firm Sonnenschein, Nath, & Rosenthal ("Sonnenschein"), responded to the OIG's letter on behalf of Allmerica (DN 169-23). Essentially, Ms. Kein's lengthy letter defended the Plan's lump sum calculation methodology, referencing the Internal Revenue Service's ("IRS") determination letter approving the Plan's lump sum calculation methodology, case law, and other legal authorities (DN 169-23).

On March 29, 2002, the OIG issued its report entitled "PWBA Needs to Improve Oversight of Cash balance Plan Lump Sum Distributions" ("OIG Report") (DN 1-3). In the

6

Executive Summary Section, the OIG observed that since the mid-1980s between 300 and 700 traditional defined benefit pension plans have converted to cash balance plans which may "affect over 8 million working Americans and involve pension assets of over $334 billion" (DN 1-3 p. 1).  The OIG indicated it conducted an audit to determine if the PWBA's "oversight of these cash balance plans was adequately protecting participants' benefits" (DN 1-3 p. 1).  Further, the OIG explained that in making this "determination, we audited a judgemental [sic] sample of 60 converted plans to see if plan administrators had complied with [ERISA]" (DN 1-3 p. 1).  The OIG advised, in 13 of the 60 plans it found that workers who left employment before normal retirement age did not receive all the accrued benefits to which they were legally entitled under ERISA (DN 1-3 p. 1).  In the text of the report, the OIG indicated the "most frequent problem found was plans not following the present value projection and discount procedures set forth in Notice 96-8" (DN 1-3 p. 11).  Notably, the OIG report did not identify the plans referred to in the report (DN 1-3).

The OIG report indicated additional PWBA "oversight and intervention could help prevent future underpayments to workers in cash balance plans and correct past underpayments, where possible, within ERISA time constraints" (DN 1-3 p. 1).  Therefore, the OIG report recommended the Assistant Secretary for Pension and Welfare Benefits strengthen the PWBA's oversight of cash balance pension plans by:

1.  Directing more enforcement resources to protecting cash balance plans' participant benefits.

2.  Initiating specific enforcement action on the 13 plans with forfeitures identified in this audit.

3.  Working with IRS to develop improved guidance for plan administrators in calculating participant accrued benefits.

(DN 1-3 p. 1).

The OIG report acknowledged that in a recent response to its draft report, the PWBA had identified "potential legal restrictions to its ability to enforce ERISA §§ 203 and 205[,]" and, because of those restrictions, the PWBA advised that it would need the Department of the Treasury's official view on the potential violations noted in the draft report to properly evaluate the OIG's recommendations (DN 1-3 p. 1-2).  Notwithstanding, the PWBA did provide the OIG with interim comments, pending an official response from the Department of the Treasury (DN 1-3 p. 2).  Specifically, the PWBA disagreed with the OIG's first recommendation set forth above (DN 1-3 p. 2).  Further, the PWBA took issue with the OIG's "methodology in determining sample size and extrapolating the error amount" and contended in the absence of "a broader survey of the problem with more detailed information it could not commit to redirecting enforcement resources to cash balance plan benefit calculations" (DN 1-3 p. 2).  However, the PWBA indicated general agreement with the OIG's second and third recommendations set forth above (DN 1-3 p. 2).  More specifically, the "PWBA agreed to take appropriate enforcement action on the 13 plans" (DN 1-3 p. 2).  However, the PWBA's specific action would be dependent on the response from the Department of the Treasury (DN 1-3 p. 2). Moreover, the "PWBA agreed to work with the IRS in determining what guidance should be developed on calculating lump sum distributions of accrued benefits in cash balance plans" (DN 1-3 p. 2).

On May 21, 2002, an article in the Boston Globe identified Allmerica as one of 13 companies referred to in the OIG report that had underpaid lump-sum payouts to workers (DN 1-3).  On May 24, 2012, a spokesman for Allmerica provided a short statement to the media indicating Allmerica was "'very confident'" that it had been "'calculating benefits in accordance with the terms of the plan and in accordance with applicable laws and regulations'" (DN 1-4).

8

Further, the spokesperson indicated the Plan had received two letters of determination from the IRS concluding that the Plan "'was qualified under the applicable code in the regulation'" (DN 1-4).

 2.  The Original Complaint

On March 9, 2007, lead Plaintiff Jennifer Durand filed the original complaint initiating this ERISA class action against her former employer, Hanover, and the Plan (DN 1). The Sixth Circuit summarized the original complaint as follows:

> Jennifer Durand worked for the company from 1995 until 2003, participating in the Plan for a total of seven and one half years. After ending her employment with [Hanover] at the age of 32, she elected in 2003 to request the pay-out of her vested benefits in the form of a lump-sum distribution. The 2007 complaint alleged that the lump-sum she received understated the present value of her accrued benefit because it applied a reduced rate for projecting interest credits. Rather than using the projected performance of the investment options Durand had individually selected from the 401(k)-style menu, the Plan applied "a uniform projection rate-the 30-Year Treasury [bond] rate." *Durand I*, 560 F.3d at 438. The 30-year Treasury bond rate was also applied to discount the projected amount of her benefit at normal retirement age back to its present value in 2003, nullifying the effect of the projection-forward. *Id.* ("The result in every case was a wash: . . . the lump-sum payout would always equal the participant's hypothetical account balance at the time of distribution." (Citation and quotation marks omitted)). Thus, the lump-sum amount Durand received was $17,038.18, identical to the amount in her hypothetical account at the time. *Id.* at 439.

Durand II, 806 F.3d at 372. The original complaint focused on the lump-sum calculation and asserted only a "whipsaw" claim under 29 U.S.C. §§ 1053(a), (e) and 1055(g), 26 U.S.C. §§ 411(a) and 417(e). Id.

The Sixth Circuit explained:

> A whipsaw claim alleges that a departing employee's lump-sum distribution understates the present value of her accrued benefit because of the use of a calculation methodology-in this case, a

> projection rate-that violates ERISA requirements.  *See generally AK Steel*, 484 F.3D 395.  While the complaint broadly defined the class to include all participants "who vested or will vest in an accrued benefit under the Plan's cash balance formula between January 1, 1995 and December 31, 2004" (R. 1 at 12), other allegations made clear that class membership was also defined by receipt of a lump-sum distribution pursuant to Defendants' whipsaw methodology (*see id.* at 13-14).  For example, the complaint alleged that class members shared common questions of fact because "[t]he computation of a participant's lump-sum distribution and the amount of the lump-sum distributions is standardized in that the amount of the lump-sum distribution for each member of the Class was calculated in the same manner as described above." (*Id.* at 13.)  Additionally, the complaint asserted common questions of law "as to each Class member, *i.e.*, whether the method of calculating the lump-sum distributions violated the law." (*Id.*)  In alleging typicality, the complaint stated that Durand "does not assert any claims relating to the Plan in addition to or different than those of the class," but that her claims are typical "in that her lump-sum distribution was calculated in the same fashion as the rest of the class." (*Id.*)  The complaint did not allege or allude to any violations of ERISA other than the improper whipsaw calculation.

Durand II, 806 at 372-73.

   3.  The Amended Complaint

On December 15, 2009, Plaintiff's filed the first amended complaint (DN 46).  In pertinent part, the amended complaint "asserted claims on behalf of all putative class members that Defendants had breached their fiduciary duty to plan members in their administration of the Plan. Durand II, 806 at 373-74.  The Sixth Circuit has provided the following description of the claims:

> The amended complaint identified two categories of breach.  First, Plaintiffs alleged that Defendants breached their fiduciary duty by interpreting and applying Plan provisions "without independently assessing whether the account balance and accrued benefit calculation provisions of the Plan complied with ERISA." (R. 46, First Amended Complaint, PageID 645, citing ERISA §§ 404(a)(1).)  Second, the amended complaint alleged in general terms that "[i]n communication with participants regarding the

10

Plan and their Plan benefits, both Defendants made material misstatements and omissions regarding the nature and manner in which they interpreted and applied the account balance and accrued benefit calculation provisions of the Plan and SPD." *(Id.* 646.)   As examples of this inadequate communication, the complaint alleged that the Summary Plan Descriptions "failed to accurately or completely apprise participants" of the methodology for calculating lump-sums because Defendants did not disclose the whipsaw calculation, the rates it used, or the reason those rates were selected, and that relatedly, Defendants "failed to disclose the 'loss of benefits'" that occurred as a result of the lower interest rates used in the whipsaw calculation.  (*Id.* at 647.)

Durand II, 806 F.3d at 374.

# CONCLUSIONS OF LAW

## A

1.  Summary of the Parties' Arguments

Plaintiffs' motion has two parts (DN 168).  The first part seeks to compel Defendant's to produce at least 385 documents[2] from the 1,125 documents withheld under a claim of attorney-client privilege and/or work product protection and identified in the seven privilege logs (DN 168, DN 169-4).  Plaintiffs contend application of the fiduciary exception to the attorney-client privilege and work product protection requires disclosure of the withheld documents (DN 170 p.

---

[2] Plaintiffs also seek production of an unknown number of documents that were generated during the May 31, 2001 through December 17, 2003 time period and "directly or in directly reflect consideration of whether it was necessary or appropriate for Allmerica (acting in any capacity) to inform one or more potentially-affected participants of the OIG's October 26, 2001 interim conclusions and March 26, 2002 final conclusions and/or directly or indirectly reflect consideration of the fact that, as the OIG report noted, the statute of limitations might foreclose participant lawsuits" (DN 170 p. 18, 19).  Plaintiff's explain "[d]ue to Defendants' inadequate logging practices . . . there is no way at present for Plaintiffs to know how many such documents exist" (DN 170 p. 19).  Plaintiffs refer to these as the "Group 2" documents in their motion and memoranda (DN 168; DN 170 p. 18-19).

4-17).  Additionally, Plaintiffs challenge the applicability of the attorney-client privilege to 87 of the documents at issue[3] (DN 170 p. 20-22).

Defendants assert the fiduciary exception does not override the attorney-client privilege and/or work product protection for these documents because they were generated for Defendants' own protection during the OIG investigation, and they relate to the structure of the Plan which is a non-fiduciary matter (DN 173 p. 1).  Further, Defendants argue there is no merit to Plaintiffs' claim that the attorney-client privilege does not apply to some of the 385 documents (DN 173 p. 1-2).

The second part of Plaintiffs' motion seeks to compel Defendants to submit individual log entries for as many as 377 documents currently included within six categorical document descriptions in one of the privilege logs (DN 168; DN 170 p. 20).  Plaintiffs claim the categorical entries lack material information necessary to properly assess Defendants' claims of attorney-client privilege and work product protection (DN 175 p. 17).  Defendants contend Plaintiffs have received privilege logs containing fulsome descriptions (DN 173 p. 2).

B

1. Plaintiffs Argument Regarding the Fiduciary Exception

Plaintiffs contend because Allmerica served as both the Plan's sponsor and Administrator the applicability of the "fiduciary exception" will depend on whether each communication concerns a matter as to which Allmerica owed a fiduciary obligation to the Plan participants (DN 170 p. 4-5 citing In re Long Island Lighting Co., 129 F.3d 268, 271-72 (2d Cir. 1997), Valente v. Pepsico, Inc., 68 F.R.D. 361, 370 (D. Del. 1975)).  Plaintiffs assert under the "fiduciary exception" to the attorney-client privilege and work product doctrine, whenever a

---

[3] Plaintiffs refer to these as the "Group 2A," "Group 2B," and "Group 2C" documents in their motion and memoranda (DN 168; DN 170 p. 20-22).

communication concerns a matter as to which the employer owes a fiduciary obligation to the plan participants, the employer is simply "disabled" from asserting the privilege because courts have uniformly held that the privilege actually belongs to the plan participants, not the employer (DN 170 p. 4-5 citing In re Long Island Lighting Co., 129 F.3d at 272).  Plaintiffs explain the "fiduciary exception" is not really an "'exception' at all, U.S. v. Mett, 178 F.3d 1058, 1063 (9th Cir. 1999), to the contrary, the default rule is that a trustee has an obligation to disclose upon request '**all**' documents concerning his management of the trust including legal advice bearing on the trustee's administration" (DN 170 p. 5 citing Id.) (emphasis in original).  Thus, assert Plaintiffs, "the employer-fiduciary is estopped from objecting to participants' request for documents because 'a fiduciary owes the obligation to his beneficiaries to go about his duties without obscuring his reasons for the legitimate inquiries of the beneficiaries.'"  (DN 170 p. 5 quoting Valente, 68 F.R.D. at 370).  Plaintiffs argue to overcome the fiduciary exception Allmerica must demonstrate the documents "solely concern non-fiduciary matters" (DN 170 p. 5 citing Everett v. USAir Group Inc., 165 F.R.D. 1, 4 (D. D. C. 1995)).

Plaintiffs argue the legal advice within the documents concerned a fiduciary matter because they addressed one or more of the following subjects: (1) the OIG investigation which addressed plan administration and benefit calculations; (2) if the Plan's lump sum calculation provisions are legal under ERISA, whether to construe them if possible to conform to the substantive requirements of ERISA, and, if necessary, whether to override them and calculate benefits in accordance with the requirements of ERISA[4]; and (3) whether or not to notify participants they have a claim for additional whipsaw benefits, and the window of opportunity to

---

[4] Plaintiffs assert that Allmerica has previously acknowledged as the administrator it has a duty to determine whether the plan terms can be lawfully implemented and to override them if they cannot (DN 170 p. 8-9 citing Durand I, 560 F.3d at 442; also citing ERISA § 404(a)(1)(D) and Curtiss-Wright v. Schoonejongen, 514 U.S. 73, 82 (1995)).

assert such claims might be closed by the statute of limitations if they do not act soon (DN 170 p. 6-9 citing Chao v. Hall Holding Co., 285 F. 3d 415, 426 (6th Cir. 2002), Osberg v. Foot Locker, Inc., No. 07 Civ. 1358(KBF), 2015 WL 570107, at *29 (S. D. N.Y. Sept. 29, 2015), and ERISA § 404(a)(1)(A), (B), and (D)).   Plaintiffs suggest Defendants have no basis for contending Allmerica received all of this legal advice in its capacity as the Plan sponsor because it can only act in that capacity when it decides to adopt, amend, or terminate a plan (DN 170 p. 7 citing Lockheed Corp. v. Spink, 517 U.S. 882, 890 (1996)).

Plaintiffs assert that advice about the legality of existing plan terms is a fiduciary matter, and it is irrelevant why Allmerica sought and/or received the legal advice (DN 170 p. 9-10 citing In re Long Island Lighting, 129 F.3d at 271-72, Durand I, 560 F.3d at 442, and ERISA § 404(a)(1)(D)).   Further, Plaintiffs reason that information Allmerica acquired as Plan sponsor is obviously known to it in its role as Plan Administrator and, thus, should be produced to the beneficiaries[5] (DN 170 p. 11).

Plaintiffs acknowledge there are two exceptions to the "fiduciary exception" but contend neither applies to Defendants.   First, the legal advice set forth in the documents does not concern a suit brought by a beneficiary claiming entitlement to greater benefits (DN 170 p. 12-17 citing Varity Corp. v. Howe, 516 U.S. 489, 514 (1996)).   Second, the legal advice set forth in the documents does not pertain to imminent criminal or civil proceedings against Allmerica for past acts of alleged fiduciary malfeasance (DN 170 p. 12-17 citing Mett, 170 F.3d at 1066).

2.   Defendants Argument Regarding the Fiduciary Exception

---

[5] Plaintiffs suggest the principal that a plan administrator must take into account information it knows through its actions as employer is at the heart of the Supreme Court's decision in Varity Corp. v. Howe, 516 U.S. 489, 504-06 (1996), "which held that a company committed a fiduciary breach under ERISA when it made misrepresentations to employees in the course of assuring them that their benefits would remain unchanged-something the company in its role as 'the employer' knew was false" (DN 170 p. 11).

14

Defendants contend that application of the "fiduciary exception" to the attorney-client privilege is limited to instances "where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity" (DN 173 p. 8 quoting Moss v. Unum Life Ins. Co., 495 F. App'x 583, 596 (6th Cir. 2012) (citations omitted)).   For example, when the administrator consults with counsel about non-fiduciary functions such as the design, amendment, or termination of an ERISA plan, Abbott v. Pipefitters Local Union No. 522 Hosp., Med., & Life Benefit Plan, 94 F.3d 236, 239 (6th Cir. 1996), Hudson v. Gen. Dynamics, 73 F. Supp. 2d 201, 202 (D. Conn. 1999), or for his "own protection" (DN 173 p. 8 citing United States v. Mett, 178 F.3d 1058, 1065 (9th Cir. 1999)).

Defendants assert that Plaintiffs' characterization of the fiduciary exception is grossly overbroad[6] and would effectively strip Allmerica of any right to obtain confidential legal advice[7] (DN 173 p. 16-20).   Defendants encourage the Court to find the "fiduciary exception" does not override the attorney-client privilege because these documents were generated for Allmerica's "own protection" in responding to a regulatory investigation that targeted the Plan terms (DN 173 p. 16-20 citing Moss, 495 F. App'x at 596, Mett, 178 F.3d at 1065-66).   Defendants contend,

---

[6] Defendants contend that courts have rejected Plaintiffs' expansive interpretation of the "'fiduciary exception' that would pierce the attorney-client privilege any time a communication tangentially relates to a fiduciary matter" (DN 173 p. 9 citing United States v. Mett, 178 F.3d 1058, 1065-66 (9th Cir. 1999), Hudson v. Gen. Dynamics, 73 F. Supp. 2d 201, 203 (D. Conn. 1999)).   Defendants point out under Plaintiffs overly broad construction of the "fiduciary exception," ERISA trustees would effectively have no attorney client privilege (DN 173 p. 9).   Moreover, assert Defendants, Plaintiffs interpretation of the "fiduciary exception" would undermine a core purpose of the attorney client privilege which is to encourage "clients (e.g., employers considering the substance and logistics of plan amendments) to make full disclosure to their attorneys" (DN 173 p. 9 quoting Mett, 173 F.3d at 1065-66) (internal quotations omitted).

[7] Defendants' assert that "ERISA plan sponsors and fiduciary's are entitled to consult with lawyers under the protection of the attorney-client privilege and the work product doctrine" (DN 173 p. 7 citing Moss v. Unum Life Ins. Co., 495 F. App'x 583, 595-96 (6th Cir. 2012), Wildbur v. ARCO Chem. Co., 974 F.2d 631, 646 (5th Cir. 1992)).   Defendants assert "[t]hese protections are subject to only a 'limited' exception to the attorney-client privilege for fiduciaries obtaining legal counsel on behalf of plan participants" (DN 173 p. 7 citing In re Long Island Lighting Co., 129 F.3d2 68, 273 (2d Cir. 1997), Chesemore v. Alliance Holdings, Inc., No. 1:10 MAC 46, 2011 WL 2037624, at *1 (N.D. Ohio May 24, 2011)).

15

Allmerica sought legal advice on its own behalf in connection with the OIG investigation because it had possible exposure or personal liability as the Plan administrator should employees bring actions for additional benefits, and because Allmerica as sponsor could be responsible for funding the Plan if the Plan were unable to pay the additional benefits contended to be due (DN 173 p. 21-22).  Defendants assert that Plaintiffs have mistakenly attempted to limit application of Mett to only instances where a trustee seeks counsel for imminent criminal or civil proceedings about the trustee's personal liability for past acts (DN 173 p. 21-22).

Defendants assert another reason the fiduciary extension does not apply here is the OIG documents relate to the structure of the Plan, not its administration (DN 173 p. 22-23). Defendants point out the Sixth Circuit recognized in Durand I that the OIG's focus was on plan structure, not administration, when it found "at no point [did] the administrator's [do] anything other than apply the methodology set forth in the Plan itself" (DN 173 p. 22-23 quoting Durand I, 560 F.3d at 442).  Additionally, Defendants accuse Plaintiffs of fabricating fiduciary duties[8] and a "claim"[9] that is not in the amended complaint in an attempt to tie the privileged documents to a fiduciary matter (DN 173 p. 23-29).

---

[8] Defendants take exception to Plaintiff's contention that ERISA § 404(a)(1)(D) and the Sixth Circuit opinion in Durand I indicate Allmerica had a duty to assess the legality of the Plan's methodology for calculating lump sum distributions, and to override the Plan's terms if they violated ERISA (DN 173 p. 25-26).  Additionally, Defendants point out that West v. AK Steel Corp., 484 F.3d 395, 405 (6th Cir. 2007) does not support Plaintiffs' argument that a plan administrator must "independently assess the legality of the Plan's benefit calculation methodology" (DN 173 p. 25; quoting DN 170 p. 26).

[9] Defendants assert Plaintiffs are speculating the withheld documents support their "claim" that Allmerica breached its fiduciary duty by concealing from participants the OIG's report and their having time-sensitive claims for additional benefits (DN 173 p. 26-29).  Defendants assert no factual basis exists because the IRS qualified the Plan after a specific review of the Plan's lump sum payment methodology (DN 173 p. 26-29).  Defendants also contend Allmerica's public statements pertaining to the OIG's conclusions and the fact it provided guidance to its human resource employees about responding to participants' anticipated questions, in the wake of the OIG's report, undermine an argument that there was concealment (DN 173 p. 26-29).

3.   Plaintiff's Reply Regarding the Fiduciary Exception

Plaintiffs argue the documents at issue appear to directly concern matters of plan administration, and Allmerica has failed to establish an exemption to the beneficiary's right-to-access (DN 175 p. 4-12).   Plaintiffs point out the OIG made its requests for information to the Plan administrator, and its report addressed the Plan administrator's interpretation and implementation of existing plan provisions (DN 175 p. 4-5).   Plaintiffs assert that Allmerica, as the Plan administrator, owed the Plan participants a duty to evaluate the merits of the OIG's contentions about the lump-sum calculations and decide whether to defend or change the Plan's existing provisions (DN 175 p. 5-6 citing Best v. Cyrus, 310 F.3d 932, 935 (6th Cir. 2002)). Plaintiffs argue the Court should direct Defendants to produce the documents at issue because Defendants are not claiming the prospect of imminent criminal or civil proceedings arising for past acts of fiduciary malfeasance (DN 175 p. 6-8).

C

1.   The Attorney-Client Privilege

The attorney-client privilege "is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389, (1981) (citations omitted).   The aim of this privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."   449 U.S., at 389; Hunt v. Blackburn, 128 U.S. 464, 470 (1888).   "However, it is not an absolute privilege.   It applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice." In re Antitrust Grand Jury, 805 F.2d 155, 162 (6th Cir. 1986) (citing Fisher v. United States, 425 U.S. 391, 403 (1975)). Further, "[t]he privilege cannot stand in the face of

17

countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose." United States v. Goldberger & Dubin, P.C., 935 F.2d 501, 504 (2d Cir. 1991).

Federal common law applies to questions of privilege in ERISA cases. Moss, 495 F. App'x at 595 (citing Fed.R.Evid. 501[10]; Swindler & Berlin v. United States, 524 U.S. 399, 403 (1998)); Shields v. Unum Provident Corp., No. 2:05-CV-744, 2007 WL 764298, at *3 (S.D. Ohio Mar. 9, 2007) (citing Reed v. Baxter, 134 F.3d 351, 355 (6th Cir.1998); Fed.R.Evid. 501). Under federal common law the elements of the attorney-client privilege are as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

Reed, 134 F.3d at 355–56 (citing Fausek v. White, 965 F.2d 126, 129 (6th Cir.1992); United States v. Goldfarb, 328 F.2d 280, 281 (6th Cir.1964)).  Notably, the party asserting the attorney-client privilege must prove its applicability.  In re Grand Jury Investigation No. 83-2-35, 723 F.2d 447, 450 (6th Cir. 1983); In re OM Securities Litigation, 226 F.R.D. 579, 590 (N.D. Ohio 2005).  Determining the applicability of the attorney-client privilege is a mixed question of law and fact. Reed, 134 F.3d 355-56.

2.   The Fiduciary Exception to the Attorney-Client Privilege

The attorney-client privilege is subject to the common law fiduciary exception.  United States v. Jicarilla Apache Nation, 546 U.S. 162, 170-173 (2011).  The Supreme Court of the

---

[10] Rule 501 of the Federal Rules of Evidence provides that, except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

United States has provided the following helpful discussion about the fiduciary exception to the

attorney-client privilege:

> English courts first developed the fiduciary exception as a principle of trust law in the 19th century.  The rule was that when a trustee obtained legal advice to guide the administration of the trust, and not for the trustee's own defense in litigation, the beneficiaries were entitled to the production of documents related to that advice.  *Wynne v. Humberston*, 27 Beav. 421, 423–424, 54 Eng. Rep. 165, 166 (1858); *Talbot v. Marshfield* 2 Dr. & Sm. 549, 550–551, 62 Eng. Rep. 728, 729 (1865).  The courts reasoned that the normal attorney-client privilege did not apply in this situation because the legal advice was sought for the beneficiaries' benefit and was obtained at the beneficiaries' expense by using trust funds to pay the attorney's fees.  *Ibid.*; *Wynne*, *supra*, at 423–424, 54 Eng. Rep., at 166.
>
> The fiduciary exception quickly became an established feature of English common law, see, e.g., *In re Mason*, 22 Ch. D. 609 (1883), but it did not appear in this country until the following century.  American courts seem first to have expressed skepticism.  See *In re Prudence–Bonds Corp.*, 76 F.Supp. 643, 647 (E.D.N.Y.1948) (declining to apply the fiduciary exception to the trustee of a bondholding corporation because of the "important right of such a corporate trustee ... to seek legal advice and nevertheless act in accordance with its own judgment").  By the 1970's, however, American courts began to adopt the English common-law rule.  See *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103–1104 (C.A.5 1970) (allowing shareholders, upon a showing of "good cause," to discover legal advice given to corporate management).
>
> The leading American case on the fiduciary exception is *Riggs Nat. Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709 (Del.Ch.1976).  In that case, the beneficiaries of a trust estate sought to compel the trustees to reimburse the estate for alleged breaches of trust.  The beneficiaries moved to compel the trustees to produce a legal memorandum related to the administration of the trust that the trustees withheld on the basis of attorney-client privilege.  The Delaware Chancery Court, observing that "American case law is practically nonexistent on the duty of a trustee in this context," looked to the English cases.  *Id.*, at 712.  Applying the common-law fiduciary exception, the court held that the memorandum was discoverable.  It identified two reasons for applying the exception.

First, the court explained, the trustees had obtained the legal advice as "mere representative[s]" of the beneficiaries because the trustees had a fiduciary obligation to act in the beneficiaries' interest when administering the trust. *Ibid.* For that reason, the beneficiaries were the "real clients" of the attorney who had advised the trustee on trust-related matters, and therefore the attorney-client privilege properly belonged to the beneficiaries rather than the trustees. *Id.*, at 711–712. The court based its "real client" determination on several factors: (1) when the advice was sought, no adversarial proceedings between the trustees and beneficiaries had been pending, and therefore there was no reason for the trustees to seek legal advice in a personal rather than a fiduciary capacity; (2) the court saw no indication that the memorandum was intended for any purpose other than to benefit the trust; and (3) the law firm had been paid out of trust assets. That the advice was obtained at the beneficiaries' expense was not only a "significant factor" entitling the beneficiaries to see the document but also "a strong indication of precisely who the real clients were." *Id.*, at 712. The court distinguished between "legal advice procured at the trustee's own expense and for his own protection," which would remain privileged, "and the situation where the trust itself is assessed for obtaining opinions of counsel where interests of the beneficiaries are presently at stake." *Ibid.* In the latter case, the fiduciary exception applied, and the trustees could not withhold those attorney-client communications from the beneficiaries.

Second, the court concluded that the trustees' fiduciary duty to furnish trust-related information to the beneficiaries outweighed their interest in the attorney-client privilege. "The policy of preserving the full disclosure necessary in the trustee-beneficiary relationship," the court explained, "is here ultimately more important than the protection of the trustees' confidence in the attorney for the trust." *Id.*, at 714. Because more information helped the beneficiaries to police the trustees' management of the trust, disclosure was, in the court's judgment, "a weightier public policy than the preservation of confidential attorney-client communications." *Ibid.*

The Federal Courts of Appeals apply the fiduciary exception based on the same two criteria. See, e.g., *In re Long Island Lighting Co.*, 129 F.3d 268, 272 (C.A.2 1997); *Wachtel v. Health Net, Inc.*, 482 F.3d 225, 233–234 (C.A.3 2007); *Solis v. Food Employers Labor Relations Assn.*, 644 F.3d 221, ——, 2011 WL 1663597, 2011

U.S.App. LEXIS 9110, *12 (CA4, May 4, 2011); *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 645 (C.A.5 1992); *United States v. Evans*, 796 F.2d 264, 265–266 (C.A.9 1986) (per curiam).

Jicarilla Apache Nation, 546 U.S. at 170-173.

A number of circuit courts have recognized the fiduciary exception to assertions of attorney-client privilege by ERISA fiduciaries.  Solis v. Food Emp's Labor Relations Ass'n, 644 F.3d 221, 227 (4th Cir. 2011) (survey of opinions from the second, third, fifth, seventh, and ninth circuits).  Essentially, the circuits have relied on two related rationales when applying the fiduciary exception in the context of ERISA.  Id.; United States v. Mett, 178 F.3d 1058, 1063 (9th Cir. 1999).  "[S]ome courts have held that the exception derives from an ERISA trustee's duty to disclose to plan beneficiaries all information regarding plan administration."  Mett, 178 F.3d at 1063 (citations omitted).  "Other courts have focused instead on the role of the trustee and have endorsed the notion that, 'as a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served.'"  Id. (quoting United States v. Evans, 796 F.2d 264, 266 (9th Cir. 1986)).

Under either rationale, when an attorney advises an ERISA plan administrator or other fiduciary concerning a matter of plan administration, the attorney's client is the plan beneficiaries for whom the fiduciary acts, instead of the plan administrator.  Solis, 644 F.3d at 227; Mett, 178 F.3d 1063; Wildbur v. ARCO Chem. Co., 974 F.2d 631, 645 (5th Cir. 1992) (citation omitted).  Thus, "a fiduciary of an ERISA plan 'must make available to the beneficiary, upon request, any communications with an attorney that are intended to assist in the administration of the plan.'"  Moss, 495 F. App'x at 595 (quoting Bland v. Fiatallis N. Am., Inc., 401 F.3d 779, 787 (7th Cir. 2005) (quoting In re Long Island Lighting Co., 129 F.3d 268, 272 (2d Cir. 1997)).  When understood "in this fashion, the fiduciary exception is not an 'exception'

21

to the attorney-client privilege at all.  Rather, it merely reflects the fact that, at least as to advice regarding plan administration, a trustee is not 'the real client' and thus never enjoyed the privilege in the first place." <u>Mett</u>, 178 F.3d at 1063 (citing <u>Evans</u>, 796 F.2d at 266).

There are two types of situations where the fiduciary exception should not be applied because counsel's advice to the ERISA plan administrator or fiduciary concerns a non-administrative or non-fiduciary matter.  <u>Solis</u>, 644 F.3d at 228; <u>Wachtel v. Health Net, Inc.</u>, 482 F.3d 225, 232-34 (3d Cir. 2007); <u>Mett</u>, 178 F.3d at 1064; <u>In re Long Island Lighting Co.</u>, 129 F.3d at 271-73; <u>Everett v. USAir Group, Inc.</u>, 165 F.R.D. 1, 4 (D.D.C 1995); Edna Selan Epstein, <u>The Attorney-Client Privilege and the Work-Product Doctrine</u>, A.B.A. SEC. PUB. LITIG. Vol. 1 at 651-62 (5th ed. 2007) (hereinafter "Epstein").  In those situations the attorney-client privilege remains intact for the ERISA plan administrator or fiduciary.  <u>Solis</u>, 644 F.3d at 228; <u>Wachtel</u>, 482 F.3d at 233-34; <u>Mett</u>, 178 F. 3d at 1064.  Thus, in the context of ERISA, while the fiduciary exception creates a presumption that plan beneficiaries are the "client" with regard to counsel's advice, that presumption can be overcome if the plan administrator demonstrates counsel's advice concerns a non-administrative or non-fiduciary matter.

The first situation involves "the 'settlor' exception, where courts distinguish between fiduciary acts and settlor acts, the former being discretionary acts of plan administration and the latter involving the adoption, modification, or termination of an employee benefit plan." <u>Wachtel</u>, 482 F.3d at 233-234 (citing <u>Lockheed Corp. v. Spink</u>, 517 U.S. 882, 891 (1996); <u>Bland</u>, 401 F.3d at 787-88); <u>Everett</u>, 165 F.R.D. at 4 (the employer/administrator is the client when legal counsel is sought regarding non-fiduciary matters such as the decision to form, amend, or terminate a plan); Epstein, <u>supra</u>, at 651-52 ("Distinctions for privilege purposes continue to be drawn in the cases between administration of the plan, to which a fiduciary duty attaches, and

decisions to create, amend, or terminate a plan, which are generally referred to as 'settlor' functions and to which many courts have held no fiduciary duty attaches.").   For example, if the administrator of a plan sought legal advice for the purpose of modifying the employee benefit plan, this would be a non-fiduciary matter, and the administrator would be the "client" component of the attorney-client privilege as to those communications with counsel.

The second situation involves the "liability" exception, where the issue is whether the fiduciary sought the advice of counsel for his or her own personal defense in contemplation of civil or criminal proceedings.   Wachtel, 482 F.3d at 233; Moss, 495 F. App'x at 595-596; Epstein, supra, at 659-660.   This exception may involve communications from counsel to the plan trustees, devoted entirely to advising them about their own personal civil and criminal exposure as a result of undocumented withdrawals that have already occurred.   United States v. Mett, 178 F.3d 1058, 1064 (9th Cir. 1999).   The "liability" exception may also involve communications between plan administrator and counsel after a final decision regarding benefits or in the context of addressing a challenge to the plan administrator in his or her personal capacity.   Moss, 495 F. App'x at 595-596; Redd v. Bhd. of Maint. of Way Emps. Div. of the Int'l Bhd. of Teamsters, No. 08-11457, 2009 WL 1543325, at *1 (E.D. Mich. June 2, 2009).   In certain circumstances, the "liability" exception may be applied to communications between plan administrator and counsel that occurred before the final decision regarding benefits.   Moss, 495 F. App'x at 596.   For example, in Moss, the plaintiff maintained she was entitled to the privileged documents under the fiduciary exception because they were created before a final benefits determination was made.   Id.   However, all of the documents sought by plaintiff had been generated after she had initiated her ERISA action for supplemental life insurance benefits against the administrator and the plan.   Id. at 585, 596.   The Sixth Circuit concluded even though

23

the communications at issue occurred prior to a final benefits decision, the fiduciary exception did not apply because the communications related to plaintiff's lawsuit and did not concern plan administration.  Id.

3.  Who Has the Burden Under the Fiduciary Exception

Plaintiffs reason because Allmerica is the employer/administrator of the Plan and it owes the plan's participants a fiduciary duty under ERISA, Allmerica must turn over the confidential communications withheld on claim of attorney-client privilege or work product protection unless it can demonstrate the responsive documents "*solely*" concern non-fiduciary matters.  (DN 170 p. 5 citing In re Long Island Lighting Co., 129 F.3d at 272 and Everett, 165 F.R.D. at 4).  Plaintiffs assert this is the best approach because a document from counsel may include legal advice to Allmerica in its capacity as employer on matters which are non-fiduciary under ERISA, but may also contain communications to Allmerica as the Plan administrator on fiduciary matters under ERISA (DN 170 p. 10-11).  Plaintiffs contend the privileged consultation on the non-fiduciary matters should not defeat the fiduciary exception that allows the Plan participants to discover the otherwise privileged communications on the fiduciary matters (DN 170 p. 10-11).

By contrast, Defendants argue Plaintiffs have the burden of proving the fiduciary exception applies to the documents at issue (DN 173 p. 7 citing Mett 178 F.3d at 1064, Fausek v. White, 965 F.2d 126, 130-31 (6th Cir. 1992)).  Further, Defendants assert Plaintiffs' interpretation of the fiduciary exception will stretch the fiduciary exception far beyond its foundations to a point where it threatens to swallow the fiduciary's attorney-client privilege whole because it will require production of privileged documents if they relate in "some minor way" to plan administration (DN 173 p. 16-20 citing Mett, 178 F.3d at 1064-66).

The Court notes that the burden of establishing the protection of the attorney-client privilege rests with the person or entity asserting it.  Shields v. Unum Provident Corp., No. 2:05-CV-744, 2007 WL 764298, at *3 (S.D. Ohio Mar. 9, 2007) (citing United States v. Dakota, 197 F.3d 821, 825 (6th Cir.1999) (citing In re Grand Jury Investigation No. 83–2–35, 723 F.2d 447, 450 (6th Cir.1983)).  If the Court applies this proposition to this case then Defendants have the burden because they are asserting the privilege.  However, the analysis does not end here.

The Court is aware that when a party asserts the crime-fraud exception to the attorney-client privilege he or she bears the burden of demonstrating the applicability of that exception.  See United States v. Zolin, 491 U.S. 554, 568 (1989).  This makes sense because the crime-fraud exception defeats or strips away the privilege when the communications between lawyer and client are "'made for the purpose of getting advice for the commission of a fraud' or crime."  Id. at 563 (quoting O'Rourke v. Darbishire, [1920] A.C. 581, 604 (P.C.)).  The Court notes that in the context of ERISA, the fiduciary exception is something of a misnomer because it does not vitiate the attorney-client privilege like the crime-fraud exception.  Instead, it sets forth a general proposition that, at least as to advice regarding plan administration, the beneficiaries are the real client, and, thus, the trustee "never enjoyed the privilege in the first place."  Mett, 178 F.3d at 1063 (citing Evans, 796 F.2d at 266).  When "[u]nderstood in this fashion, the fiduciary exception is not really an 'exception' to the attorney-client privilege at all."  Id.  Because of this substantial distinction, case law regarding the crime-fraud exception is not an appropriate source for guidance on the question of burden.

While no court appears to have expressly ruled on the question of burden, the majority of courts addressing the fiduciary exception, in the context of ERISA, appear to have reasoned the employer/administrator/trustee has the burden of demonstrating the communications withheld on

claim of privilege are not subject to the fiduciary exception.  *See e.g.*, <u>Solis</u>, 644 F.3d at 231, 233 (the party claiming the privilege bears the burden of demonstrating its applicability to the withheld communications); <u>Long Island Lighting</u>, 129 F.3d at 271-273 (the employer/administrator of the plan bears the burden of showing the documents do not concern a fiduciary matter); <u>Everett</u>, 165 F.R.D. at 4 (same); Epstein, <u>supra</u>, at 651-62 (administrator bears the burden of demonstrating the communications were made after commencement of litigation or do not concern an administrative or fiduciary matter).  For example, in <u>Everett</u>, the district court concluded the employer/administrator failed to show the disputed documents "relate solely to non-fiduciary activities or to the formation, amendment or termination of the pension plan."  165 F.R.D. at 4.  By contrast, in <u>Long Island Lighting</u>, the Second Circuit implicitly concluded the employer/administrator satisfied its burden because no one had questioned the magistrate judge's finding that the disputed documents "clearly related to non-fiduciary matters only."  129 F.3d at 272-73.   Thus, in the context of ERISA, the majority view appears to be the employer/administrator has the burden of demonstrating counsel's communications concerned non-administrative/non-fiduciary matters or personal representation in potential or pending litigation.

The <u>Mett</u> case involves a direct appeal from criminal convictions arising out of certain improper transactions involving pension benefits plans administrated by defendants.  178 F.3d at 1060-64.  The Ninth Circuit reversed the convictions and remanded for a new trial because the trial court erroneously admitted highly prejudicial evidence against the defendants in violation of the attorney-client privilege.  <u>Id.</u> at 1060-68.  In <u>Mett</u>, the Ninth Circuit indicated the government had the burden of demonstrating the fiduciary exception applied to counsel's confidential communications.  178 F.3d at 1064.  The Ninth Circuit did not provide any supporting analysis

beyond citation to <u>United States v. Bauer</u>, 132 F.3d 504, 509 (9th Cir. 1997) and the parenthetical comment "government has the burden of showing crime-fraud exception to attorney-client privilege[.]" <u>Mett</u>, 178 F.3d at 1064. Thus, the Ninth Circuit looked to crime-fraud exception case law for guidance in determining who had the burden. While the Ninth Circuit's view may be appropriate in a criminal case, this is a civil case, and the majority view places the burden on the plan administrator to demonstrate counsel's confidential communications are not subject to the fiduciary exception. *See e.g.*, <u>Wachtel</u>, 482 F.3d at 232; <u>Long Island Lighting</u>, 129 F.3d at 271-73; <u>Everett</u>, 165 F.R.D. at 4; Epstein, <u>supra</u>, at 651-52. Moreover, while the Sixth Circuit and several district courts within the Sixth Circuit have discussed the <u>Mett</u> opinion they have followed what appears to be the majority view when addressing the fiduciary exception in ERISA cases. <u>Moss</u>, 495 F. App'x at 595-96; <u>Moss v. Unum Life Ins. Co.</u>, No. 5:09-CV-209, 2011 WL 321738, at *2-5 (W.D. Ky. Jan. 28, 2011); <u>Thies v. Life Ins. Co. of N. Am.</u>, 768 F. Supp.2d 908, 911-912 (W.D. Ky. 2011); <u>Redd</u>, 2009 WL 1543325, at *1-2; <u>Shields v. Unum Provident Corp.</u>, No. 2:05-CV-744, 2007 WL 764298, at *4-5 (S.D. Ohio Mar. 9, 2007). Therefore, the Court declines to follow <u>Mett</u> with regard to who bears the burden in this instance.

Digressing for a moment, a sound proposition that may be drawn from <u>Mett</u> is that the context and content of the communications must be considered in determining whether the fiduciary exception applies to the withheld communications. <u>Id.</u> at 1064. Obviously, an *in camera* evaluation of each document must be conducted in order to assess the content of counsel's confidential communications with the plan trustee because the same attorney may advise the trustee in both his fiduciary and nonfiduciary capacities at different times. <u>Id.</u> at 1064

(citing <u>Long Island Lighting</u>, 129 F.3d at 272).[11]  Another proposition that may be drawn from

<u>Mett</u> is that the fiduciary exception should not defeat the attorney-client privilege whenever

otherwise privileged legal advice to a trustee tangentially "relates to" fiduciary matters.[12]  <u>Id.</u> at

1064-66 (citing <u>Long Island Lighting</u>, 129 F.3d at 272).

Defendants' reliance on <u>Fausek</u> is misplaced because it involves application of the <u>Garner</u>

doctrine which applies when shareholders have sued the corporation alleging it acted inimically

to their interests.  965 F.2d at 129-31.  The <u>Garner</u> rule requires shareholders to demonstrate

"good cause" why the veil of privilege should be cast aside with regard to confidential

communications between the corporation and the corporation's counsel.  <u>Id.</u> at 132-133.  The

<u>Garner</u> "good cause" requirement is inconsistent with the majority view in ERISA cases which

presumes the beneficiaries are the "client" component of the attorney-client privilege unless the

fiduciary demonstrates the confidential communications concern a non-fiduciary matter.  *See*

*e.g.*, <u>Moss</u>, 495 F. App'x at 595-96; <u>Wachtel</u>, 482 F.3d at 232; <u>Long Island Lighting</u>, 129 F.3d at

271-73; <u>Thies</u>, 768 F. Supp. at 911-12; <u>Redd</u>, 2009 WL 1543325 at *1; <u>Shields</u>, 2007 WL

764298, at *4-5; <u>Everett</u>, 165 F.R.D. at 4; Epstein, <u>supra</u>, at 650.

In sum, the Court will first assess whether each document is subject to the attorney-client

privilege.  Next, the Court will determine who was the client at the time each document was

prepared.  Since Defendants are withholding the documents on claim of privilege, they bear the

---

[11] Notably, district courts within the Sixth Circuit and the Western District of Kentucky have conducted an *in camera* evaluation of each document to determine whether the fiduciary exception applies in cases brought under ERISA.  <u>Moss v. Unum Life Ins. Co.</u>, No. 5:09-CV-209, 2011 WL 321738, at *2-5 (W.D. Ky. Jan. 28, 2011); <u>Thies v. Life Ins. Co. of N. Am.</u>, 768 F. Supp.2d 908, 911-912 (W.D. Ky. 2011); <u>Redd v. Bhd. of Maint. of Way Emps. Div. of the Int'l Bhd. of Teamsters</u>, No. 08-11457, 2009 WL 1543325, at *1-2 (E.D. Mich. June 2, 2009); <u>Shields v. Unum Provident Corp.</u>, No. 2:05-CV-744, 2007 WL 764298, at *4-5 (S.D. Ohio Mar. 9, 2007).

[12] The Ninth Circuit expressed concern that an overly expansive view of the fiduciary exception could swallow the entirety of the attorney-client privilege for ERISA trustees, undermine the justifying rationales for this exception, and create inconsistent applications of the privilege by the courts.  <u>United States v. Mett</u>, 178 F.3d 1058, 1064-66 (9th Cir. 1999).

burden of demonstrating that each of the documents at issue are subject to the attorney-client privilege, and that they were the clients with regard to the privileged communications, not the plan beneficiaries.

D

1.  The Parties' Arguments Regarding the Fiduciary Exception and Work Product

Plaintiffs assert that Defendants' claim of work product protection for 346 of the documents at issue must fail because plan fiduciary's have no right to keep secret from plan participants any legal work performed regarding plan administrative matters (DN 170 p. 37 citing Solis v. Food's Employers Labor Relations Assoc., 644 F.3d 221, 233 (4th Cir. 2011); Everett, 165 F.R.D. at 5).

Defendants argue the fiduciary exception does not apply to documents protected by the work product doctrine (DN 173 p. 7, 15; citing In re Teleglobe Commc'ns Corp., 493 F.3d 345, 385 (3d Cir. 2007); Cox v. Adm' r U.S. Steel & Carnegie, 17 F.3d 1386, 1423 (11th Cir. 1994); Wildbur v. ARCO Chem. Co., 974 F.2d 631, 646 (5th Cir. 1992); Jicarilla Apache Nation v. United States, 88 Fed. Cl. 1, 12 (2009); Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co., 951 F. Supp. 679, 687 (W.D. Mich. 1996); In re Rospatch Sec. Litig., Nos. 1:90-CV-805, 1:90-CV-806, 1:90-CV-807, 1:91-CV-085, 1991 WL 574963, at *13 (W.D. Mich. Mar. 14, 1991)). Moreover, Defendants argue the cases cited by Plaintiffs do not support their contention regarding the fiduciary exception and documents protected by the work product doctrine[13] (DN 173 p. 15; citing Solis, 644 F.3d at 233, Everett, 165 F.R.D. at 5).

---

[13] Defendants point out in Solis v. Food's Employers Labor Relations Assoc., the Fourth Circuit "ultimately found 'no reason to reach the issue of whether the work product doctrine is subject to the fiduciary exception'" (DN 173 p. 15 quoting 644 F.3d 221, 233 (4th Cir. 2011). Defendant indicate in Everett, the district court concluded defendants could assert work product protection provided the subject documents were not "prepared in anticipation of litigation on behalf of the plan beneficiaries" (DN 173 p. 15 citing 165 F.R.D. at 5).

2.  The Work Product Doctrine

The protection afforded work product is not a privilege as the term is used in the Federal Rules of Civil Procedure or the law of evidence.  Hickman v. Taylor, 329 U.S. 495, 509-510 & n. 9 (1947).  Instead, work product provides a qualified protection from discovery because work product materials, except for that which reveals an attorney's mental impressions and opinions, may be ordered produced if an adverse party demonstrates "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by any other means."  Fed. R. Civ. P. 26(b)(3); In re Perrigo Co., 128 F.3d 430, 437 (6th Cir. 1997); Toledo Edison Co. v. G.A. Tech., Inc., 847 F.2d 335, 338-41 (6th Cir. 1988).

The Supreme Court first enunciated the protection afforded work product in Hickman and Rule 26(b)(3) later codified part of this protection.  Rule 26 Advisory Committee Notes.  The scope of Rule 26(b)(3) is limited to documents and tangible things, In re Perrigo Co., 128 F.3d at 437, whereas the principles enunciated in Hickman apply to non-tangible work product sought through depositions, interrogatories, and requests for admissions.  One Tract of Real Property, 95 F.3d 422, 427-28 & n. 10 (6th Cir. 1996).

To determine whether a document has been prepared "in anticipation of litigation," and is thus protected work product, the Court must ask two questions: (1) whether that document was prepared "because of" a party's subjective anticipation of litigation, as contrasted with ordinary business purpose; and (2) whether that subjective anticipation was objectively reasonable. United States v. Roxworthy, 457 F.3d 590, 594 (6th Cir.2006).  Documents prepared in the ordinary course of business, pursuant to regulatory requirements, or for other non-litigation purposes are not considered prepared in anticipation, and as a result are not subject to the work product protection.  Solis, 644 F.3d at 232 (citation omitted).  However, if a document is

prepared in anticipation of litigation, the fact that it also serves an ordinary business purpose does not deprive it of protection.  Roxworthy, 457 F.3d at 598–99.  Thus, the party claiming the document is subject to protection must show that anticipated litigation was the "driving force behind the preparation of each requested document."  Id. at 595 (quoting Nat'l Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co., 967 F.2d 980, 984 (4th Cir.1992)).  The party claiming the protection bears the burden of demonstrating the work product protection applies.  Solis, 644 F.3d at 232 (citation omitted).

3.   The Fiduciary Exception and the Work Product Doctrine

Defendants cite several cases in support of their contention that the fiduciary exception does not extend to the work product doctrine.  However, these cases cited involved the question of whether the Garner doctrine applies to work product in corporate shareholder actions, union actions, and actions relating to federal tribal authorities.  See, In re Teleglobe Commc'ns Corp., 493 F.3d 345, 385 (3d Cir. 2007) (acknowledged argument that Garner doctrine does not apply to work product but left the issue for the district court to resolve on remand); Cox v. Adm' r U.S. Steel & Carnegie, 17 F.3d 1386, 1423 (11th Cir. 1994) (refused to apply Garner doctrine to work product in action by union members against union); Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co., 951 F. Supp. 679, 687 (W.D. Mich. 1996) (agreed with courts that have held the Garner doctrine does not apply to work product); In re Rospatch Sec. Litig., Nos. 1:90-CV-805, 1:90-CV-806, 1:90-CV-807, 1:91-CV-085, 1991 WL 574963, at *13 (W.D. Mich. Mar. 14, 1991) (acknowledged courts have held the Garner shareholder exception does not apply to work product); Jicarilla Apache Nation v. United States, 88 Fed. Cl. 1, 12-13 & n. 16 (2009) (relied on Garner doctrine case law to conclude the fiduciary exception does not apply to work product doctrine in action by tribe against United States for alleged mismanagement of tribal trust funds).

Thus, the relevance of these decisions to application of the fiduciary exception to work product protection in the ERISA context is questionable at best. Solis, 644 F.3d at 232.

The ERISA context differs from the corporate context and more closely involves fiduciary duties owed directly to participants and beneficiaries. Id. Several courts have applied the logic of common law trusts from which the fiduciary exception to the attorney-client privilege was extrapolated to the ERISA context, and they have found that the exception similarly applies to the work product doctrine. Id. Those courts have reasoned a trustee's attorney should not withhold work product from the actual client, the trust beneficiaries. *See* Everett, 165 F.R.D. 5 (finding the ERISA fund attorneys may not "shield their attorney work product from their own ultimate clients, the plan beneficiaries ... insofar as [documents] were prepared in anticipation of litigation on behalf of the plan beneficiaries"); Martin v. Valley Nat'l Bank, 140 F.R.D. 291, 320–21 (S.D. N.Y. 1991) (rejected work product protection claim by ERISA fund attorneys in context of Department of Labor suit on behalf of fund participants); *see also* Cobell v. Norton, 213 F.R.D. 1, 13 (D.D.C. 2003) (found the work product doctrine "applicable only where the material is developed exclusively for purposes other than the benefit of trust beneficiaries, i.e., *solely* to aid in litigation") (emphases added). *Cf.* Aull v. Cavalcade Pension Plan, 185 F.R.D. 618, 626 (D.Colo.1998) (acknowledged that "when the documents at issue are related to allegedly improper actions of ERISA fiduciaries, discovery often is permitted despite a claim of work product privilege," but refused to reach the issue of whether fiduciary exception applied); Donovan v. Fitzsimmons, 90 F.R.D. 583, 587–88 (N.D. Ill. 1981) (ordered disclosure of work product relating to ERISA trustees' investment decisions, subject to the *Garner* doctrine's good cause standard, "lest the work-product immunity swallow up the [fiduciary] exception in its entirety"). The Court finds these persuasive authorities demonstrate

there is no legitimate basis on which to distinguish between the attorney-client privilege and the work product protection when applying the fiduciary exception in the ERISA context.  *See* <u>Solis</u>, 644 F.3d at 632-33 (concluded there was no legitimate basis on which to distinguish between the "two privileges" in the application of the fiduciary exception in the ERISA context").

As indicated above, the Fourth Circuit in <u>Solis</u> provided a thorough analysis of whether the work product doctrine is subject to the fiduciary exception in the ERISA context.  644 F.3d 231-33.  The Fourth Circuit concluded "[t]hese persuasive authorities demonstrate that there is no legitimate basis on which to distinguish between the [attorney-client privilege and work product doctrine] in the application of the fiduciary exception in the ERISA context."  <u>Id.</u> at 233.  The Court finds the Fourth Circuit's conclusion compelling because it appreciated the difference between the fiduciary exception in the context of shareholder actions, where the *Garner* doctrine is applied, and the ERISA context, where the *Garner* doctrine does not apply.  <u>Id.</u> at 232-33.  Contrary to Defendants' suggestion, the Fourth Circuit's analysis does not become any less compelling merely because it observed that the Funds had failed to carry their burden of demonstrating the applicability of the work product doctrine to specific documents, and, therefore, saw "no reason to reach the issue of whether the work product doctrine was subject to the fiduciary exception."  <u>Id.</u> at 233.

In <u>Wildbur v. ARCO Chem. Co.</u>, before completion of the administrative review process, plaintiffs filed suit against the plan administrator to recover benefits under the plans.  974 F.2d 631, 634 (5th Cir. 1992).  After completion of administrative review process, one of the witnesses that plaintiffs sought to depose was Richard Anderson, an ARCO in-house attorney.  <u>Id.</u> at 635.  However, ARCO moved to quash the deposition on the grounds of relevance, the attorney-client privilege, and the work product doctrine.  <u>Id.</u>  The magistrate judge ruled that

plaintiffs could depose Mr. Anderson but only about his communications with the plan administrator before plaintiffs filed suit because his communications after that point in time were protected from discovery by the attorney-client privilege and/or work product doctrine.  Id. at 635, 645-46.  The magistrate judge reasoned that, after plaintiffs filed suit, "the mutuality of interests between the plaintiffs and Mr. Anderson, which is a prerequisite to the existence of the fiduciary exception to the attorney/client privilege, ceased to exist . . ." Id. 645-46.

On appeal, plaintiffs challenged only the magistrate judge's ruling that Mr. Anderson's communications with the plan administrator after the suit was filed were protected from discovery by the attorney-client privilege.  Id. at 646.  The plaintiffs reasoned they were still plan beneficiaries and Mr. Anderson, "as an attorney for the plan, still bore a fiduciary relationship toward them."  Id.  The Fifth Circuit noted neither the magistrate judge in her ruling nor defendants in their appellate brief cited "any authority approving an exception to the rule that the attorney-client privilege is not implicated when plan members seek to discover communications between a plan's administrator and its lawyer merely because the interests of the plan administrator is not then coincidental to the interests of all plan beneficiaries."  Id.

Notwithstanding, the Fifth Circuit found it unnecessary to address plaintiffs' claim about the attorney-client privilege, "because even if plaintiffs were correct on this argument, we would still affirm the magistrate judge's decision."  Id.  The Fifth Circuit explained that plaintiffs had not challenged the magistrate judge's ruling that Mr. Anderson's communications were also protected from discovery by the work product doctrine.  Id.  The Fifth Circuit observed "[b]ecause the attorney work product protection fosters interests different from the attorney-client privilege, it may be successfully invoked against a pension plan beneficiary even though the attorney-client privilege is unavailable."  Id. at 646 citing Helt v. District Comm'n, 113

34

F.R.D. 7, 12 (D. Conn. 1986).  Therefore, the Fifth Circuit declined to disturb the magistrate judge's conclusion that Mr. Anderson's communications with the plan administrator after plaintiffs filed suit were protected by the work product doctrine.

The circumstances before this Court are distinguishable from those in <u>Wildbur</u>. Nonetheless, the Court agrees with the general proposition that the work product protection and the attorney-client privilege foster different interests, and, as a result, one may be successfully invoked in circumstances where the other is not available.  Further, <u>Wildbur</u> articulates the proposition that the Court must look to the circumstances of the case in assessing whether communications between counsel and the administrator are protected from discovery by the work product doctrine.

In sum, the Court will first assess whether each document is subject to the work product protection.  Next, the Court will determine who was the client at the time the work product was prepared.   Since Defendants are withholding the documents, they bear the burden of demonstrating each of the documents at issue were prepared in anticipation of litigation.

E

Fully armed with these legal principles, the Court will turn to the documents themselves. While Plaintiffs have referred to groups of documents in making their arguments, the Court concludes the better approach is to assess the claims of attorney-client privilege and work product protection in the context of key events that occurred between May 2001 and December 2003.  This approach allowed the Court to consider the circumstances that motivated the creation of each document and the actual content of the document.

1

The first milestone event is the OIG's letter and documentation request, dated May 31, 2001, notifying the Plan's sponsor, Allmerica, that the OIG wanted access to certain Plan related information and material in connection with the OIG's audit of the PWBA (DN 169-14 p. 2). The OIG's letter also indicated the Plan had been "judgmentally [*sic*]", as opposed to randomly, selected for this review.  The Court questions whether Defendants have sustained their burden of demonstrating this letter and documentation request was a sufficient reason for them to have a subjective anticipation of litigation.  Notwithstanding, Defendants have not demonstrated their purported subjective anticipation was objectively reasonable.  But even if they had, under the fiduciary exception, the Plan beneficiaries would be entitled to access to the withheld documents because the documents indicate the Plan Administrator, Ms. Rieck, was involved in the process of preparing responses to the OIG's request for information and materials concerning the Plan, and this was an act of plan administration.

The withheld documents indicate that the Plan Administrator and Allmerica sought and received legal advice from Allmerica's in-house counsel and outside legal counsel (the Sonnenschein firm) in connection with responding to the OIG's request for certain Plan related information and material.  Further, the accounting firm of PricewaterhouseCoopers ("PwC"), who was involved in administration of the Plan, served as a client representative in confidential communications made for the purpose of facilitating counsels' rendition of legal services to the clients.  While there are confidential communications conveying legal advice, under the fiduciary exception, the Plan beneficiaries are entitled to access to the withheld documents because the documents indicate the Plan Administrator was involved in the process of preparing responses to the OIG's request for information and materials concerning the Plan, and this was an act of plan

36

administration.   The Court is aware that some of the correspondence has attached copies of documents pertaining to the process of converting the Plan from a traditional pension plan to a cash balance plan.   While these documents concern an amendment to the Plan and ordinarily might be considered beyond the scope of the fiduciary exception, that is not the case here because the documents were utilized in the context of preparing a response to the OIG's request for information and materials which is an act of plan administration.

For the reasons set forth above, Defendants are directed to produce the following withheld material which addresses the time frame May 31, 2001 through October 25, 2001: DentonsPriv0000001-0000007, DentonsPriv0000102-0000112, DentonsPriv0000347-0000636, DentonsPriv0000941-0000954,        DentonsPriv0000974-0000975;        HanoverPriv0032-0038, HanoverPriv0045-0055, HanoverPriv0057-0058, HanoverPriv0087a, HanoverPriv00121-122, HanoverPriv00134-136; PwCPriv0057-58, PwCPriv0061-0070.

2

The next milestone event is the OIG's letter, dated October 26, 2001, and attached "NOTICE OF POSSIBLE REFERRAL" which presents the results of the OIG's review of materials pertaining to the Plan.   The OIG's letter requested that Allmerica respond to its conclusion that two sampled participants in the Plan "may have suffered forfeitures of pension benefits in violation of ERISA §§203 and 205" because of how the Plan calculated the amount of their lump sum distributions (DN 169-3 p. 2-4).   The OIG's letter clearly indicates that the results of its review of the Plan "will be referred to management officials" with the DOL, and that "[a]dditional actions may be initiated as a result of that referral" (Id. p. 2).   By letter dated November 30, 2001, Attorney Leslie A. Klein[14] issued a response on behalf of Allmerica that disagreed with the OIG's conclusions, and explained why Allmerica believed the Plan is in full

---

[14] Attorney Leslie A. Klein was an attorney with the Sonnenschein law firm.

37

compliance with IRS Notice 96-8 and all applicable provisions of ERISA (DN 169-23 p. 2-11). The documents indicate that the accounting firm of PricewaterhouseCoopers ("PwC"), who was involved in administration of the Plan, served as a client representative in connection with preparing Attorney Klein's response to the OIG letter and notice.

Unquestionably, Defendants have sustained their burden of demonstrating after receiving the OIG letter and notice, the withheld documents were prepared because of a subjective anticipation of regulatory litigation that was objectively reasonable.  While Defendants had concerns about lump sum recipients bringing claims for additional benefits, there was not an objectively reasonable basis for anticipating such litigation during this time frame because the Plan participants were unaware of these confidential communications between the OIG and Attorney Klein.  Stated differently, an objectively reasonable basis for anticipating such litigation is contingent on the lump sum recipients finding out that they had suffered forfeitures of pension benefits.

Under the fiduciary exception, the Plan beneficiaries are entitled to access to these documents withheld on the claim of work product protection because the documents indicate the Plan Administrator, Ms. Rieck, was involved in the process of preparing a response to the OIG letter and the attached "NOTICE OF POSSIBLE REFERRAL," and this was an act of plan administration.  Cobell v. Norton, 213 F.R.D. 1, 10-13 (D.D.C. 2003) (if counsel developed material for the benefit of the trust beneficiaries or the material serves a dual purpose the work product doctrine will not prevent disclosure of the documents to the beneficiaries).  Moreover, because the Plan beneficiaries are the clients, they are entitled to the attorneys' mental impressions set forth within the documents withheld on claim of work product protection.

38

Martin v. Valley Nat'l Bank, 140 F.R.D. 291, 320–21 (S.D. N.Y. 1991) (concluding attorney cannot withhold their work product, including their 'intellectual product', from the client).

The withheld documents also indicate that the Plan Administrator and Allmerica sought and received legal advice from Allmerica's in-house counsel and outside legal counsel (the Sonnenschein firm) in connection with responding to the OIG's October 26, 2001 letter and notice. Under the fiduciary exception, the Plan beneficiaries are entitled to access to these withheld documents because the documents indicate the Plan Administrator was involved in the process of preparing Attorney Klein's response to the OIG's letter and notice. The Court is aware that some of the correspondence have attached copies of documents pertaining to the process of converting the Plan from a traditional pension plan to a cash balance plan. While these documents concern an amendment to the Plan and ordinarily might be considered beyond the scope of the fiduciary exception, that is not the case here because the documents were utilized in the context of preparing a response to the OIG's letter and notice, an act of plan administration.

For the reasons set forth above, Defendants are directed to produce the following withheld material which addresses the time frame October 26, 2001 through November 30, 2001: DentonsPriv0000008-0000101, DentonsPriv0000113-0000346, DentonsPriv0000933-0000940, DentonsPriv0000955-0000973, DentonsPriv0000976-0001030; HanoverPriv0039-0044, HanoverPriv0056, HanoverPriv00115-120.

3

The next milestone event is the OIG report entitled "PWBA Needs to Improve Oversight of Cash Balance Plan Lump Sum Distributions" and dated March 29, 2002 (DN 1-3). Defendants have already sustained their burden of demonstrating their subjective anticipation of

regulatory litigation was objectively reasonable.   Certainly, the OIG's report increased Defendants' concerns about the prospect of lump sum recipients bringing claims for additional benefits.   However, the OIG's report did not identify the 13 plans that purportedly made insufficient lump-sum payouts to workers.   Again, an objectively reasonable basis for anticipating such litigation is contingent upon the lump sum recipients finding out that they had suffered forfeitures of pension benefits.   Moreover, the withheld documents indicate through May 16, 2002, the Plan Administrator, Ms. Rieck, was involved in discussions with in-house and outside counsel about the OIG's report, and her involvement was an act of plan administration. Therefore, the Court concludes that under the fiduciary exception, the Plan beneficiaries are entitled to documents generated between March 29, 2002 and May 20, 2002, that have been withheld on claim of attorney-client privilege and work product protection.

The event that made Allmerica's subjective anticipation of Plan beneficiary litigation objectively reasonable is a May 21, 2002 article in the Boston Globe that identified the 13 plans referred to in the OIG's report, and the media coverage that followed.   Understandably, on May 30, 2002, Allmerica retained the Sonnenschein law firm to defend it against the Plan beneficiaries, the IRS, and DOL (DentonsPriv0001108-0001110).   Moreover, on that same day, the Sonnenschein law firm engaged PricewaterhouseCoopers ("PwC") to assist in "the factual review and investigation" in connection with the law firm's representation of Allmerica (DN 173-2).

In sum, documents that Defendants have withheld on claim of attorney-client privilege or work product protection that were generated between March 29, 2002 and May 20, 2002, are subject to the fiduciary exception, and, therefore, should be produced.   By contrast, the documents that Defendants have withheld that were generated on or after May 21, 2002 are

subject to the attorney-client privilege and work product protection, but the fiduciary exception does not apply to these documents because Allmerica and the Plan administrator were no longer involved in acts of plan administration.  Plaintiffs have referred to these documents as Group 2A. The Court has determined that numerous spread sheets PwC prepared, between May 21, 2002 and October 14, 2002, are subject to the work product protection because they were prepared at the direction of Allmerica's counsel, and that Allmerica had a subjective anticipation of Plan beneficiary litigation that was objectively reasonable.  The Court concludes that Plaintiffs have not waived their right to brief the issue of whether these spread sheets are discoverable under Fed.R.Civ.P. 26(b)(3)(A) because the Defendants asserted the documents were subject to both the attorney-client privilege and the work product protection.  Now that the Court has determined the spread sheets are subject to the work product protection, Plaintiffs can decide whether to argue the materials may be discovered.

For the reasons set forth above, Defendants are directed to produce the following withheld material:      DentonsPriv0001111-0001169,      DentonsPriv0001205-0001234; HanoverPriv0110 (produce pages 1-6, **but do not produce pages 7-8 because the notes memorializing a meeting with in-house and outside counsel on October 14, 2002 are subject to the attorney-client privilege**), HanoverPriv0187-0191, HanoverPriv0202, PwCPriv0059-0060.

4

Defendants have withdrawn their claim of privilege as to a June 17, 2002, letter from Roger Siske of Sonnenschein Nath & Rosenthal to J. Kendall Huber, Esq. of Allmerica, because it was written to be disclosed to potential buyers of certain portions of Allmerica's business (DN 204, 206, 207).  Defendants continue to withhold all drafts of the letter on the grounds they are

41

subject to the attorney-client privilege (DN 206 p. 6-7 citing Guy v. United Healthcare Corp., 154 F.R.D. 172, 178 (S.D. Ohio 1993)).   However, Defendants reliance on Guy is misplaced because it fails to fully set forth the holding in Schenet v. Anderson, 678 F.Supp. 1280 (E.D. Mich. 1988).   In Schenet the court held the attorney-client privilege applies only to those portions of the preliminary drafts that reflect client confidences and legal advice, and were not revealed in the document made public.   Schenet, 678 F.Supp. at 1284 ("The privilege is waived only as to those portions of the preliminary drafts ultimately revealed to third parties.").   Thus, Defendants are directed to produce the preliminary drafts but only after they have redacted those portions reflecting client confidences and legal advice that was not revealed in the letter dated June 17, 2002.   Further, the Court concludes the fiduciary exception does not apply to the redacted portions of these documents because Allmerica and its counsel were not involved in an act of plan administration.

For the reasons set forth above, Defendants are directed to produce **redacted versions** of HanoverPriv0029; HanoverPriv0304; HanoverPriv0305; HanoverPriv0307; HanoverPriv0309; DentonsPriv0001095-1098 (Tab 201); DentonsPriv0001101-1104 (Tab 204); DentonsPriv0001185-01188 (Tab 222); DentonsPriv0001193-1196 (Tab 226); DentonsPriv0001239-0001246 (Tab 235); DentonsPriv0001247-0001252 (Tab 236); and DentonsPriv0001253-01258 (Tab 237).[15]

5

The Court notes that the issue of relevance seems to be limited to what Plaintiffs refer to as the Group 2 documents.   Plaintiffs describe the Group 2 documents as having been generated during the May 31, 2001 through December 17, 2003 time period and "directly or in directly reflect consideration of whether it was necessary or appropriate for Allmerica (acting in any

---

[15] Defendants identified each of the above documents as drafts of the June 17, 2002 letter (DN 207).

capacity) to inform one or more potentially-affected participants of the OIG's October 26, 2001 interim conclusions and March 26, 2002 final conclusions and/or directly or indirectly reflect consideration of the fact that, as the OIG report noted, the statute of limitations might foreclose participant lawsuits"[16] (DN 170 p. 18, 19).   Defendants contend that the Plaintiffs' claim to the Group 2 documents is based purely on speculation (DN 173).   Arguing that the Plaintiffs have failed to produce any evidence that the withheld documents contain the alleged information, the Defendants assert that courts "have uniformly refused to compel production in these circumstances" (Id. (citing King v. Univ. Healthcare Sys., L.C., 745 F.3d 713, 721 (5th Cir. 2011).   The in camera review of the withheld documents has not revealed any Group 2 documents.   Therefore, the Court need not address the issue of relevance.

6

The Court will now address the five documents that Plaintiffs refer to as Group 2B.   Two of these documents are copies of an opinion letter, dated October 15, 2003, that Attorney Klein with the Sonnenschein law firm sent to Denise Maffeo with PwC related to PwC's audit of the Plan (DentonsPriv0001336-0001343 at Tabs 269 and 270).   The evidence in the record indicates the opinion letter was prepared at the request of the Plan administrator, Ms. Rieck, in connection with an annual audit of the Plan.   Thus, Defendants have not demonstrated the 2003 PwC audit was being conducted in anticipation of litigation, rather than for regular business purposes. Additionally, if the October 15, 2003 letter was subject to work product protection, then the fiduciary exception would apply to the letter because the Plan administrator's oversight of the financial audit was an act of plan administration.   Therefore, Defendants are directed to produce

---

[16] Plaintiffs are not certain of how many, or whether, such documents exist, but argue that Defendants' inadequate logging practices make such knowledge presently impossible to obtain (DN 170 at p. 18).

both copies of the opinion letter dated October 15, 2003 (DentonsPriv0001336-0001343 at Tabs 269 and 270).

The other three documents in Group 2B are preliminary drafts of the October 15, 2003 opinion letter (DentonsPriv0001344-1356 at Tabs 271-273).  Certainly, preliminary drafts of documents intended to be made public may be protected by the attorney-client privilege to the extent they contain client confidences and/or legal advice of an attorney.  *See* Schenet v. Anderson, 678 F.Supp. 1280, 1284 (E.D. Mich. 1988).  However, the attorney-client privilege is waived "as to those portions of the preliminary drafts ultimately revealed to third parties" Id. (citing United States v. Willis, 565 F.Supp. 1186, 1193 (S.D. Iowa 1983); S.E.C. v. Texas International Airlines, Inc., 29 F.R. Serv. 2d 408, 410 (D.D.C. 1979)).  Here, the three documents are preliminary drafts of the opinion letter that Attorney Klein sent to a third party, Ms. Maffeo, in connection with PwC's annual audit of the Plan.  Thus, the privilege was waived only as to those portions of the three preliminary drafts ultimately revealed to Ms. Maffeo.  But, the privilege was not waived as to those portions of the three preliminary drafts that were not revealed to Ms. Maffeo.  However, the fiduciary exception applies to the privileged portions because the preliminary drafts were prepared at the request of the Plan administrator, Ms. Rieck, and involve an act of plan administration.  Therefore, Defendants are directed to produce the three preliminary drafts of the October 15, 2003 opinion letter (DentonsPriv0001344-1356 at Tabs 271-273).

7

The November 3-6, 2003 email string that Plaintiffs refer to as Group 2C, involves communications between the Plan Administrator, Ms. Rieck, Allmerica's Vice President and Associate General Counsel, Joseph W. MacDougall, Jr., and Attorney Klein with the

Sonnenschein law firm regarding a draft 204(h) notice to Plan beneficiaries (HanoverPriv0087b). Clearly, the fiduciary exception applies to these documents because they were prepared at the request of the Plan administrator, Ms. Rieck, and involve an act of plan administration.

For the reasons set forth above, Defendants are directed to produce the following withheld material: DentonsPriv0001336-0001356; HanoverPriv0087b.

F

As previously mentioned, the second part of Plaintiffs' motion seeks to compel Defendants to submit individual log entries for as many as 377 documents currently included within six categorical document descriptions in one of the privilege logs (DN 168; DN 170 p. 20). Plaintiffs claim the categorical entries lack material information necessary to properly assess Defendants' claims of attorney-client privilege and work product protection (DN 175 p. 17). Defendants contend Plaintiffs have received privilege logs containing fulsome descriptions (DN 173 p. 2).

After conducting an *in camera* review of the documents within the six categorical document descriptions in the Dentons privilege log, the Court concludes that Defendants should provide Plaintiffs with individual log entries for those documents. The descriptions should clearly indicate whether Defendants are asserting the attorney-client privilege or work product protection, and "describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed.R.Civ.P. 26(b)(5)(A). Providing this information will assist Plaintiffs in determining which documents are being withheld on claim of work-product protection and whether they can show substantial need for the materials to prepare their case and cannot, without undue hardship, obtain the substantial

45

equivalent of these documents by other means.   Fed.R.Civ.P. 26(b)(3)(A); In re Perrigo Company, 128 F.3d 430, 437 (6th Cir. 1997) (citations omitted).


## ORDER

**IT IS HEREBY ORDERED** that Plaintiffs' motion to compel production of allegedly privileged documents and submission of more complete privilege logs (DN 168, 170; DN 169 Sealed) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that **by no later than November 11, 2016**, Defendants shall produce the following documents:

> DentonsPriv0000001-0000636, DentonsPriv0000933-0001030, DentonsPriv0001111-0001169, DentonsPriv0001205-0001234, and DentonsPriv0001336-0001356;
>
> HanoverPriv0032-0058, HanoverPriv0087a, HanoverPriv0087b, HanoverPriv0115-0122, HanoverPriv0134-0136; HanoverPriv0187-0191, HanoverPriv0202, and HanoverPriv0110 (produce pages 1-6, **but do not produce pages 7-8 because these notes memorializing a meeting with in-house and outside counsel on October 14, 2002 are subject to the attorney-client privilege**);
>
> PwCPriv0057-0070

**IT IS FURTHER ORDERED** that **by no later than November 11, 2016**, Defendants shall produce **redacted versions** of the following documents:

> HanoverPriv0029;     HanoverPriv0304;     HanoverPriv0305; HanoverPriv0307; HanoverPriv0309; DentonsPriv0001095-1098 (Tab   201);     DentonsPriv0001101-1104   (Tab   204); DentonsPriv0001185-01188 (Tab 222); DentonsPriv0001193-1196 (Tab   226);     DentonsPriv0001239-0001246   (Tab   235); DentonsPriv0001247-0001252   (Tab   236);     and DentonsPriv0001253-01258 (Tab 237).[17]

---

[17] Defendants identified each of the above documents as drafts of the June 17, 2002 letter (DN 207).

**IT IS FURTHER ORDERED** that **by no later than November 11, 2016**, Defendants shall produce individual log entries for each of the documents included within the six categorical document descriptions in the Dentons privilege log.

Copies to:      Counsel of Record